## NATIONAL LABOR RELATIONS BOARD v. VINCENNES STEEL CORPORATION.

No. 7351.

Circuit Court of Appeals, Seventh Circuit.

Jan. 3, 1941.

TREANOR, Circuit Judge, dissenting in part.

———◆———

Robert B. Watts, Gen. Counsel, National Labor Relations Board, of Washington, D. C., for appellant.

Wm. Hill, Joseph W. Kimmell, and Gilbert Shake, all of Vincennes, Ind., for appellee.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is before us upon petition of the National Labor Relations Board, (hereinafter called the "Board") for enforcement of an order issued by it against respondent pursuant to Section 10(c) of the National Labor Relations Act, hereinafter called the "Act", 29 U.S.C.A. § 151 et seq. Respondent is an Indiana Corporation, having its principal place of business at Vincennes, Indiana, where the alleged unfair labor practices occurred.

The charges were preferred by the International Association of Bridge and Structural Iron Workers, Local 585 (hereinafter referred to as the "Union"), by Virgil Wright, secretary and treasurer of that organization. Complaint was issued November 9, 1938, an answer filed thereto denying unfair labor practices as alleged, and a hearing was held from December 1 to 7, 1938, before a trial examiner. The respondent, Union, and the Board were represented by counsel and participated in the hearing. On February 3, 1939, the trial examiner filed an intermediate report in which he found that respondent had engaged, and was engaging, in unfair labor practices within the meaning of Section 8 (1) and (3), and Section 2(6) and (7) of the Act, and recommended that respondent cease and desist from its unfair labor practices and take certain affirmative action to remedy them. Respondent filed exceptions to the intermediate report, but made no appearance at the oral argument had before the Board September 26, 1939. On November 17, 1939, the Board rendered its decision setting forth its findings of fact, conclusions of law, and order.

The Board's finding that the respondent was engaged in interstate commerce is not in dispute. It also found that respondent, on April 6 and 7, 1938, discriminated with regard to the hire and tenure of six named employees, and later discharged two named employees because of their union activities, all in violation of Section 8(3) of the Act. The Board also found that the respondent violated 8(1) of the Act by inducing its employees to subscribe to a stock purchase agreement containing a provision barring requests for wage increases. It also found, by reason of the foregoing and other acts, that respondent interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by Section 7, thus violating Section 8(1) of the Act. The Board's order was the usual one predicated upon such findings and will be referred to subsequently.

Respondent, in opposing the petition for enforcement, makes four contentions: (1) The Board was without jurisdiction, (2) the findings of the Board are not supported by substantial evidence, (3) there is no public policy against profit sharing or stock purchasing plans for employees, and (4) the Board is without authority to require respondent to "cease and desist from" certain unfair labor practices, of which it denies it has been guilty.

The jurisdictional attack is based upon the fact that the charge made to the Board, upon which its complaint issued, was

by the International Association of Bridge and Structural Iron Workers, Local 585, when it was disclosed at the hearing that this Union was no longer in existence, but that the proper and correct name of the Union was International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 585. Thus, it will be observed that the word "Ornamental" was omitted from the Union's name as it was signed to the charge. It is argued by the respondent that under the Act, Section 10 (b), and the rules and regulations issued by the Board in conformity with the Act, the charge is jurisdictional and that inasmuch as the charge was signed by a nonentity, the Board was without jurisdiction to issue its complaint, and that the entire proceeding must fail. So far as we are advised, or are aware, the question as to just what is necessary in this respect, in order to give the Board jurisdiction, had not been judicially determined. Respondent, in support of its contention, cites National Labor Relations Board v. Hopwood R. Company, 2 Cir., 98 F.2d 97, and National Licorice Company v. National Labor Relations Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799. The Hopwood case, it is true, held that the complaint and the subsequent hearing must be in accord with the charge. In the Licorice Company case, it was merely held that the hearing must be confined to unfair labor practices related to those alleged in the charge. Neither of these cases is of any material benefit to respondent. Here, there is no contention but that the hearing was had upon the charges as made. The defect in the name attached to the charge appeared on the first day of the hearing, but no question was raised in this respect until the conclusion of the hearing. That respondent had knowledge of the Union which had preferred the charge is evident from the fact that the Union, by its officials and attorney, was present and participated in the hearing. There is no claim that respondent was in any way misled by the erroneous name employed by the Union in preferring the charge. Whatever might be said under different circumstances, we are of the opinion that respondent is in no position to raise the jurisdictional issue, and that its contention in this respect must be denied.

In view of our limited authority as announced in numerous decisions of the Supreme Court, it appears to be a useless proceeding to review in detail the testimony for the purpose of ascertaining if the findings of the Board are supported by substantial evidence. In the instant case, on the findings essential to the Board's order, we have read the arguments pro and con, as well as the testimony relative thereto, and are of the opinion, with certain exceptions hereinafter noted, that they are substantially supported.

As is common in such cases, the Board emphasizes respondent's alleged hostility toward a labor organization. We think it must be conceded in this, or any other case, that acts and statements by an employer hostile to a union, may properly be determined as discriminatory, but which would not be so considered coming from an employer with a friendly attitude.

In the instant case, talk concerning a labor Union commenced about January 1, 1938. One witness for the Board testified that respondent's superintendent Uland, when informed of such agitation, said: "That he didn't think that the boys would ever organize the shop because the plant would close down and they would shut the doors before they would recognize the Union." Notwithstanding that this statement was denied by the superintendent, the Board found, as a fact, it was made. Thus, we are bound by a finding which requires that the case be considered in the light that respondent was hostile to the proposed Union, and did not intend to recognize it.

About the first of March, 1938, respondent's general manager instructed its auditor to draft an employee stock purchase plan. This plan, as pointed out by respondent, had been considered for a number of years. One witness testified that one of respondent's supervisory employees said: "They were going to issue some stock for the boys and the reason for that is, that they are going to try to keep the boys from wanting to join the Union."

On April 4, a meeting was held at Union headquarters located on Main Street in Vincennes for the purpose of organization. Ten employees who attended, signed applications for Union membership. Two days later, one Crawford, who had been laid off on March 19, was rehired by Uland. Crawford testified, in effect, that he was told by Uland: "We laid you off because we figured that we had some other men here that were more valuable than you, but we found out they were not loyal to the company. We figure now that you would be

more loyal than they are, so now you will be on steady." On the following day, Crawford and six other employees were laid off. Again Uland denied Crawford's testimony, but the Board found that the statement was made by Uland, as testified by Crawford. On April 9 and 11, certain employees met at the Union headquarters where thirteen or fourteen additional employees enrolled as members of the Union. Uland, on the occasion of each of these meetings, admittedly was on the street at or near the Union headquarters. It is contended—in fact, the Board found—that the purpose of Uland's presence was to spy on the meetings with a view of determining which of its employees were participating in the meetings. On the other hand, it is respondent's theory that Uland's presence was merely a coincidence and that he was on the street the same as many other persons. While the testimony in support of the Board's finding in this respect is far from satisfactory, yet, in view of Uland's hostile attitude, which we must assume, we are not prepared to say that the reasonable inferences arising from his presence near the Union meetings, under the circumstances related, were other than for the purpose ascribed to him by the Board.

On April 7, all of respondent's 26 employees, other than those who had been laid off, met, at respondent's request, in the basement of the plant to hear Stevens' introduction of the stock purchase plan. It was explained to the men, and they were told a second meeting would be called the following week, at which time the stock would be offered. In the meantime, according to Stevens he learned of the union activity and hesitated concerning the stock plan for fear it would violate the Act. Shortly thereafter, 22 of the employees presented respondent with a petition requesting that it proceed with the stock plan. Another meeting of employees was held on April 20, when subscription lists were opened to the employees, and within seven days thereafter, 26 of the employees had signed the stock purchase plan. Subsequently, the Union membership by the time of the hearing had decreased to ten. The stock purchase plan provided for the issuance of ten shares of stock of a par value of $100 to each subscriber, who gave his note to respondent for $1,000. The note was to be paid by the application of stock dividends and any bonuses which respondent might declare. A provision of the plan required the subscribing employee to work at the same hourly wage he was then receiving. The plan also contained a provision that either the respondent or a subscriber could terminate the contract at any time upon conditions which, in effect, would leave the parties in status quo.

■ The record in one respect, at least, is rather convincing, and that is, that supervisory officials of respondent were quite active, and in some instances, insistent that the employees subscribe for stock. There is testimony that when a union organizer, together with certain employees, met with respondent's manager Stevens and requested respondent to enter into a contract with the Union, that Stevens promised to take the matter up with the Board of Directors and advise them. Later, Stevens, by letter addressed to the secretary of the Union, stated: "From information that has come to us recently, it appears that our shop employees are satisfied with existing conditions." At the hearing Stevens testified that the information referred to in the letter had reference to the stock purchase plan.

■ The stockholder employees organized and held regular meetings on respondent's premises. As to the purpose of these meetings, one witness testified: "To report on anything that they see that they don't think is being done according to the way the company would want it done." The Board found that the stock purchase plan was promulgated as a device to circumvent the Union, and that, as a result thereof, respondent has interfered with, restrained, and coerced its employees in violation of the Act. Accepting the circumstance most favorable to the Board, as we are obligated to do, we think its finding in this respect must be sustained. Our conclusion is predicated upon the facts of this particular case and not upon any public policy which ipso facto condemns such a plan. We do not subscribe to the argument predicated upon the views of certain economists that a plan of this character is inherently bad or in contravention of the Labor Act. Such a plan, according to our view, might be beneficial both to the employer and the employee, especially the latter, entered into in the utmost good faith, and without interference with, or restraint upon, the rights of the employee as guaranteed by the Act. The plan under consideration, however, which binds the employees to refrain from requesting a raise

in wages is, on its face, invalid. It deprives the employee of the right to designate an agent to bargain with reference thereto.

The Board found that six employees, namely Wright, Crawford, Richardson, Deem, Eddleman and Hall, were discriminatorily laid off. Here again the evidence, in some respects, is rather persuasive in support of respondent's contention that such was not the case. It is significant, however, that the layoff was decreed within three days after the Union meeting of April 4, when all the employees thus affected joined the Union except one, and he was a Union sympathizer. All of these men were reinstated to their positions within from two or three weeks, and respondent argues that the rehiring of them, with knowledge of their union affiliation, is inconsistent with the idea that they were laid off for such reason. At first blush there appears to be merit in this contention, but it must be remembered that in the meantime, charges had been filed with the Board against respondent, and some of the men were not reinstated until after a conference between the respondent and a representative of the Board. It is not unreasonable to conclude, therefore, that respondent, after charges had been preferred, realized its mistake in laying off the men, and reinstated them for that reason. Without relating in detail the evidence, we are of the opinion that the finding of the Board as to these six men must be sustained.

Two other employees, Melvin and Sievers, found by the Board to have been discriminatorily discharged, are in a different category. The former was discharged August 12, 1938, and the latter September 6, 1938, both several months after the occurrence of the main controversy between respondent and the Union—in fact, many weeks subsequent to the time charges were preferred against the respondent. The inferences which the Board draws from certain facts with reference to these two men are less persuasive than those with reference to the six employees laid off, to which we have already referred.

It is true, Melvin was a member of the Union and refused to purchase stock. He testified that Uland, on April 22, 1938, when urging him to purchase stock, said: "This is the contract that the Steel Corporation is going to operate under." This statement is denied by Uland, but the Board found that the statement was made and places much stress upon it. His discharge was almost four months later, long after respondent had reinstated the six employees previously referred to, who were also members of the Union, and some of whom had also refused to purchase stock. We confess we are unable to find any support in this situation for the Board's finding. It was the contention of respondent that Melvin was discharged because of physical incapacity occasioned by defective vision. He was examined by respondent's physician, upon whose report respondent acted. Prior to the hearing, however, Melvin was examined by an outside eye specialist who gave testimony at the hearing contradicting, in some particulars, that given by respondent's physician. There was no dispute, however, but that his vision was defective—the contrariety of opinion having to do with the character and nature of his ailment. The material question, however, is not the character or extent of his disability but whether respondent acted in good faith in discharging him. In other words, did the respondent discharge him because of its honest belief that his vision was impaired so as to interfere with the proper discharge of his duties? The burden was upon the Board to show that the discharge was on account of his Union activities. We are of the opinion that there is no substantial support for the Board's finding in this respect. In addition, respondent proposed at the hearing that the Board select an eye specialist to examine and report upon the condition of Melvin's vision. It was further proposed that if a disinterested physician, selected by the Board, found that his sight was such as to enable him to perform his work, that respondent would re-employ him. This offer was refused by the Board, which it stated then, and argues now, was immaterial. We think it was material to the extent that it shows the good faith of respondent and furnishes rather strong support to its contention that his discharge was the result of his physical disability rather than his Union activity.

The Board's finding with reference to Sievers is predicated largely upon Uland's hostile Union attitude, and his knowledge that Sievers was a Union member and actively engaged in soliciting his fellow employees to sign applications for membership. It is pointed out that he openly displayed his affiliation by wearing a Union button at work. The reason given by re-

spondent for his discharge was that he was lazy, incompetent and refused to properly perform his duties. He joined the Union April 9, and prior to April 30, 1938, was employed as a fireman. Shortly prior to the latter date, he was found asleep on the job, so it is asserted, and was taken off of his job as fireman and assigned to doing various jobs in the yard. The Board finds that the charge that he was found asleep on the job was merely a pretext for transferring, and then discharging him. He was not discharged, however, until September 6, more than four months subsequent to his transfer, which was about the same time the six employees above discussed were reinstated. If respondent had wanted or intended to discharge Sievers because of his Union activity, it seems reasonable to believe that he would have been discharged at that time rather than four months later. There is no claim that he was discriminated against by reason of his transfer, and we think it must be assumed that the transfer was ordered by respondent for a just cause. At any rate, it was without complaint on the part of Sievers. It is also pointed out that he was one of the men who refused to purchase stock, but this refusal was also prior to the time of his transfer. The Board also relies upon an incident which occurred on August 11, concerning which Sievers testified that he was ordered by Uland to discontinue keeping his car in the company garage, and that Uland stated on that occasion: "That garage is for the company men." Sievers is corroborated as to what was said on this occasion by the witness Crawford. Uland denied such statement, and claimed that he had merely admonished the men not to put their cars in his particular stall. The Board refused to credit Uland's version of this incident and points out that before that time the garage had been opened to all of respondent's employees. The undisputed fact is, that the garage contained six stalls. We fail to find any evidence as to the number of employees, office help and supervisory officials who had cars, but we assume the number was more than six. We think the incident is without material significance. It does not furnish the basis for a healthy suspicion, much less a reasonable inference. We have read all of the testimony, including that of Sievers, regarding the manner in which he performed his duties, and we think there can be no question but that his discharge was justified. In fact, respondent would have been within its rights in discharging him in April, at the time he was transferred to other work. The fact that respondent saw fit to permit him to remain in its employment performing tasks of lesser responsibility, does not merit the inference that when he was discharged four months later, it was because of his Union activity rather than his incompetence.

The affirmative requirements of the Board's order are in the form usually found in a case of this character, and we see no reason to refer to them in detail. Paragraph 2(a) requires respondent to offer Melvin and Sievers reinstatement to their former positions, and 2(b) to make them whole for any loss of pay suffered by reason of their discharge. In view of what we have said, these requirements will not be enforced.

In paragraph 2(c) there is a requirement that certain sums deducted from the amounts to be paid to the employees named in said paragraph, be paid over to certain specified governmental agencies. This requirement is invalid. Republic Steel Corp. v. National Labor Relations Board and S. W. O. C., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. ——, decided by the Supreme Court November 12, 1940. The Board has suggested that paragraph 2(e) of its order be modified so that the notices required to be posted will read "that it will cease and desist from the unfair labor practices found." With this modification, we are of the opinion that the order as to notice is proper. National Labor Relations Board v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396.

The Board's order is modified in conformity with the views herein expressed, and as so modified its petition for enforcement is allowed.

TREANOR, Circuit Judge (concurring in part and dissenting in part).

I believe there was substantial evidence to support the finding and order of the Board respecting the reinstatement of Melvin and Sievers. In all other respects I concur in the opinion and decision of the Court.