**NEVADA CONSOL. COPPER CORPORATION v. NATIONAL LABOR RELATIONS BOARD.**

No. 2196.

Circuit Court of Appeals, Tenth Circuit.

Aug. 27, 1941.

BRATTON, Circuit Judge, dissenting.

C. C. Parsons, of Salt Lake City, Utah (J. F. Woodbury, of Silver City, N. M., and H. M. Fennemore, of Phœnix, Ariz., on the brief), for petitioner.

Morris P. Glushien, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laur-

ence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Hilda D. Shea, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS and BRATTON, Circuit Judges, and KENNAMER, District Judge.

PHILLIPS, Circuit Judge.

This is a petition to review an order of the National Labor Relations Board.[1]

For approximately 15 years prior to 1924, the Chino Copper Company,[2] a corporation, owned and operated an open pit copper mine at Santa Rita and a reduction works at Hurley, in Grant County, New Mexico. In 1924, the physical assets of Chino were acquired by the Ray Consolidated Copper Company.[3] It continued to operate the property until 1926. In the latter year, Nevada Consolidated Copper Company[4] acquired the physical assets of Ray, including the Chino mine and the Ray mine in Arizona. In 1933, the physical assets of Nevada were acquired by the Kennecott Copper Corporation.[5] In 1933, Kennecott caused the incorporation of the Nevada Consolidated Copper Corporation[6] to serve as an operating company. Petitioner has operated the Chino properties since 1933.

In 1924, W. S. Boyd became general manager of the Chino and Ray properties. In 1926, he became managing director of Nevada and had operating charge of the Chino, Ray, and Nevada properties. In 1930, he became vice-president of Nevada and continued in operating charge of the three properties. In 1933, he became vice-president of the petitioner and had operating charge of the three properties from that time to and including December 7, 1939, the date of the last hearing herein.[7]

R. B. Tempest became assistant to the general manager of the Chino properties in 1923. He became acting general manager in 1933 and on January 1, 1934, was appointed general manager and continued in that capacity until the date of his death, May 7, 1938.

Harry A. Thorne was in the continuous employ of petitioner and its predecessors from 1909 to December 7, 1939. From 1920 to December 7, 1939, he was superintendent of the Chino mine.

In July, 1933, after the enactment of the National Industrial Recovery Act, 48 Stat. 195, an employees' representative plan was organized at Santa Rita and Hurley. It was sponsored by the petitioner. Certain of the employees at Santa Rita organized the Chino Mine Workers Union No. 63. A charter was granted to Local 63 on March 24, 1934. Certain of the employees at Hurley organized the Hurley Mill Workers Union No. 69. A charter was granted to Local 69 on September 27, 1934. The locals were affiliated with the International Union of Mine, Mill and Smelter Workers. Prior to September 15, 1934, Tempest refused a demand of Local 63 for recognition as exclusive bargaining agent at Santa Rita and Hurley. Tempest stated he would recognize Local 63 as the representative of the group, but not as the agent for the whole body of employees. Thereupon, Local 63 petitioned the old Board, created under Public Resolution No. 44 (73d Cong., 2d Sess.) to administer the provisions of § 7(a) of the National Industrial Recovery Act, 48 Stat. 198, for an election to determine the exclusive bargaining representative. The election was held September 15, 1934, and the vote at Hurley was 87 for and 129 against Local 63 and the vote at Santa Rita was 215 for and 92 against Local 63. The petitioner fully cooperated with the Regional Labor Board in the holding of the election. The Regional Labor Board certified Local 63 as the exclusive bargaining agent of the employees at Santa Rita and refused to certify it at Hurley.

On September 24, 1934, the petitioner ceased operations and closed down the property. It posted notices to that effect on October 9, 1934. It was then contemplated that the shut down would last from 5 to 10 years. For several years prior to September, 1934, the price of copper had been very low and the work period at Santa Rita and Hurley had been reduced by petitioner to about 13 days per month. Operations at Ray were closed down in 1932. From 1931 to September, 1934, petitioner lost two and a half million dollars through its operations at Santa Rita and Hurley. In the late summer of 1934, the copper market became further depressed and sales became negligible. The directors of Ken-

---

[1] Hereinafter called the Board.
[2] Hereinafter called Chino.
[3] Hereinafter called Ray.
[4] Hereinafter called Nevada.

[5] Hereinafter called Kennecott.
[6] Hereinafter called petitioner.
[7] Hearings were held May 2 to 6, 1938, June 13, 1938, and December 7, 1939.

necott ordered a 20 per cent reduction at the Chino mine. It was impossible to operate the property on such a reduced basis and the mine was closed down.

On October 12, 1934, Local 63 charged petitioner with having shut down the mine at Santa Rita in violation of § 7(a) of the National Industrial Recovery Act and the Code of Fair Competition for the Copper Industry. The charge was referred to the Mountain States Regional Labor Board. A hearing was had on February 13 and 14, 1935. The Regional Labor Board found that the petitioner, due to the low price of copper, had been operating at a loss for more than 12 months; that for many months the petitioner had been gradually reducing the work period and the number of employees; that the condition of the copper market was a major factor in arriving at the decision to close the mine; and that the proximate cause of the. shut down was a purely economic one. It further found "that there was no interference, restraint or coercion exercised by respondents toward complainants or any member of their organization, nor was any attempt made by respondents to prevent the organization or other activities of complainants, and it appears further that any opinion expressed by the bosses or foremen or any of them to any of the members of complainants' union had no influence in the election. * * *"

During 1934, there existed no labor dispute or controversy of any character between petitioner and its employees.

In the fall of 1936, due to an improvement in general business conditions and a substantial increase in the demand for copper, Kennecott gave instructions to petitioner to renew operations January 1, 1937. A few men were employed in the fall of 1936. On January 1, 1937, operations were started in a small way and were gradually increased to about half capacity in February, 1937. The operations continued at half capacity for the balance of 1937. Toward the end of 1937, the demand slackened again and orders were issued petitioner to reduce production. Commencing early in 1938, the operations were reduced until they were back to a minimum rate of production and petitioner was again losing money.

At the time of the shut down, Local 63 had a membership of 331, and there were 315 day pay employees at Santa Rita, 139 of whom were not members of Local 63 and 176 of whom were members of Local 63.

In February, 1937, one month after resumption of operations, there were employed at Santa Rita 376 day pay employees, of whom 269, or 71 per cent, were not employed in September, 1934, and 107, or 29 per cent, were employed in September, 1934. Of the 107 employed in September, 1934, 32, or 30 per cent, were members of Local 63, and 75, or 70 per cent, were not members of Local 63. In addition, 15 employed in February, 1937, who were not on the September, 1934 payroll, were members of Local 63.

On April 1, 1938, there were employed at Santa Rita, 528 day pay employees, of whom 425, or 80 per cent, were not employed in September, 1934, and 102, or 20 per cent, were employed in September, 1934. Of the 102 employed in September, 1934, 37, or 36 per cent, were members of Local 63, and 65, or 64 per cent, were not members of Local 63. In addition, 13 employed in April, 1938, who were not on the September, 1934 payroll, were members of Local 63.

In December, 1939, there were employed at Santa Rita, 736 day pay employees, of whom 606, or 82 per cent, were not employed in September, 1934, and 130, or 18 per cent, were employed in September, 1934. Of the 130 employed in September, 1934, 57, or 44 per cent, were members of Local 63, and 73, or 56 per cent, were not members of Local 63. In addition, 29 employed in December, 1939, who were not on the September, 1934 payroll, were members of Local 63.

At the time of the shut down, there were 185 day pay employees at Hurley, of whom 59 were members of Local 69 and 126 were not members of Local 69. In February, 1937, there were employed at Hurley, 376 day pay employees, of whom 302, or 80 per cent, were not employed in September, 1934, and 74, or 20 per cent, were employed in September, 1934. Of the 74 employed in September, 1934, 18, or 24 per cent, were members of Local 69, and 56, or 76 per cent, were not members of Local 69. In addition, 12 employed in February, 1937, who were not on the September, 1934 payroll, were members of Local 69.

In April, 1938, there were 503 day pay employees at Hurley, of whom 435, or 86 per cent, were not employed in September, 1934, and 68, or 14 per cent, were employed in September, 1934. Of the 68 employed in

September, 1934, 25, or 37 per cent, were members of Local 69, and 43, or 63 per cent, were not members of Local 69. In addition, 12 employed in April, 1938, who were not on the September, 1934 payroll, were members of Local 69.

In December, 1939, there were employed at Hurley 746 day pay employees, of whom 656, or 88 per cent, were not employed in September, 1934, and 90, or 12 per cent, were employed in September, 1934. Of the 90 employed in September, 1934, 39, or 43 per cent, were members of Local 69, and 51, or 57 per cent, were not members of Local 69. In addition, 12 employed in December, 1939, who were not on the September, 1934 payroll, were members of Local 69.

Upon an amended charge filed by the International Union of Mine, Mill and Smelter Workers, the Board, on April 21, 1938, issued its complaint against petitioner charging that since January 1, 1937, petitioner had refused to reinstate or to give employment to 61 specified individuals "because they had joined and assisted the Union and engaged in concerted activities with other employees for the purpose of collective bargaining and other mutual aid and protection, thereby discouraging membership in the Union and interfering with, restraining, and coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act." In its answer, petitioner denied the unfair labor practices. During the hearing, the complaint was amended by adding the names of 61 other individuals. The Board found that petitioner by discriminating in regard to the hire and tenure of employment of the persons whose names are set forth in Note 8 (a), (b), and (c), thereby discouraging membership in Locals 63 and 69, had engaged in unfair labor practices within the meaning of §§ 8(1) and 8(3) of the Act, 29 U.S.C.A. § 158(1) (3).

The Board ordered that petitioner cease and desist from

"(a) Discouraging membership in International Union of Mine, Mill and Smelter Workers, Locals Nos. 63 and 69, or in any other labor organization of its em-

8(a) Avalos, Felipe
Castro, Juan
Dull, Frank
Esquedo, Antonio

Grijalva, Genaro
Munoz, Emilio
Horcasitas, Eustacio
Cooley, T. H.

8(b) Arellano, Emilio
Arrey, Primitivo
Avalos, Marcello
Baxter, J. W.
Benjamin, J. L.
Candelaria, Juan
Cordova, Juan
Costales, Francisco
Delgado, Nicolas
Elvira, Carlos
Esqueda, Cipriano
Gruwell, Angus

Hererra, Pedro
Hopkins, Williams Horace
Hunter, Elmer W.
Jaurigui, Juan
Lopez, Francisco
Perea, Bautista
Robertson, James L.
Serna, Jose
Walker, Albert H.
Wedell, Charles
Williams, Charles H.
Zamora, Thomas

8(c) Allen, Earl
Alvarado, Bonifacio
Arispe, Gregorio
Beck, Joseph
Benjamin, T. B.
Carr, Asa T.
Castenda, Juan
Chavez, Eusebio
Crittenden, V. H.
Cruz, Antonio
Garcia, Miguel
Goetz, Lee
Grado, Julio
Gumfory, Ray
Hicks, Ira
Hobbs, Charles
Horcasitas, Julian
Horcasitas, Ramond

Howe, John
Jaurigui, Geronino
Kemp, Joseph
Kirker, Rafael
Lopez, Ignacio
Macias, Julian
Marquez, Everado
Marquez, Ramon
McCraney, J. L.
Moreno, Ysmael
Murillo, Encarnacion
Padron, Conrado
Sias, Simon
Smith, Kenneth
Vera, Juan
Waggoner, Orvil
Weaver, L. B.

ployees, by refusing to hire, discharging, or refusing to reinstate any of its employees or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the National Labor Relations Act [29 U.S.C.A. § 157]," and offer immediate employment at the same or substantially equivalent positions at which they would have been employed had the petitioner not discriminated against them, to the persons named in Note 8(b) and (c), who have not already received such employment.

It also made awards to the persons named in Note 8(a), (b), and (c) for the losses suffered by them by reason of refusal of employment by petitioner.

The Board introduced evidence to the effect, subject to the exceptions hereinafter noted, that the persons named in Note 8(a), (b), and (c) were employed by petitioner up to the time the mine ceased operations in September, 1934, for periods ranging from three and one-half to twenty-six years; that they were members of either Local 63 or 69; that they applied for reemployment, and that reemployment was either affirmatively refused or that they were not employed in response to their applications.

Gregorio Arispe and Raymundo Horcasitas were not previously employed. Ray Gumfory, Julio Grado, and Everardo Marquez had been employed but their employment had terminated prior to the shut down in September, 1934. The employment of Gumfory ceased in 1930 and Grado and Marquez in 1933. Pedro Herrera, Antonio Cruz, and Francisco Lopez had been employed prior to the shut down in September, 1934, but there was no evidence as to when their employment terminated.

Julian Horcasitas, T. B. Benjamin, Juan Bera, Rafael Kirker, Pedro Herrera, and Simon Sias did not apply for reemployment. Horcasitas testified he did not apply because petitioner knew he was a union man and many union men had told him he could not get a job, and, moreover, that he would not work for petitioner unless it recognized the union. Horcasitas was on a list hereinafter referred to which Tempest gave to Thorne with instructions not to reemploy the men whose names appeared thereon. Benjamin testified that he did not apply because Neutard, a boilermaker foreman, told him in the latter part of November, 1936, that petitioner was not putting on any union men. Benjamin was on the Tempest list. Juan Bera testified he did not apply because his companions at Santa Rita told him they were taking men from outside places. He was on the Tempest list under the name of Juan Vera. Kirker testified he did not apply because other members of the union had been denied employment. He was on the Tempest list. Pedro Herrera testified he did not apply because he belonged to the union and he believed the petitioner would not employ him. He was on the Tempest list. Simon Sias testified he did not apply because his relatives told him some of the union members had not been reemployed. He was on the Tempest list.

Ray Gumfory testified that foreman Forsythe told him, "You are wasting your time and money looking for a job. Andy was too active in the union." Andy Gumfory, a cousin of Ray, was president of Local 63.

Elmer W. Hunter testified that Harold Moses, pit foreman, told him if he had anything to do with the union he would not get a job.

Geronimo Jaurigui testified that Claude Danley, a foreman, told him in June, 1937, that he did not know, but he thought Jaurigui had been denied reemployment on account of the union.

Ismael Moreno testified that foreman Ben Gray, in the latter part of 1936, told his father that Ismael cut his neck when he joined the union.

Carlos Elvira testified that in 1937, Hill, foreman of the carpenter department at Hurley, told him he probably would not be reemployed because he had been in the union.

Manuel T. Martinez testified that he applied for work in November, 1936; that superintendent Hodges at Hurley asked him what he thought of the union; that he replied, "If it [the union] comes back, I am an union man"; that Hodges then told him, "We don't need your services."

Raymundo Horcasitas testified that he applied to superintendent Thorne for work in November, 1936. Thorne asked him who he was; that he told Thorne he was a son of Eustacio Horcasitas; that Thorne then told him there was no chance for work.

Orvil Waggoner testified that he applied for work in December, 1936; that the secretary to superintendent Hodges asked him if he belonged to the union at Santa Rita and that he answered in the affirmative; that the secretary then said he did not think that would help him.

J. L. McCraney testified that shovel repair foreman, Forsythe, told him in the spring of 1937 that the petitioner was not putting back any of the old men who belonged to the union.

Jose Serna testified that he applied to superintendent Hodges for work in December, 1936, and that Hodges asked him if he joined the union in 1934.

The first officers of Local 63 were as follows: C. M. Gumfory, president; Martin Gallegos, vice-president; J. I. Kemp, financial secretary and treasurer; Samuel Sanez, recording secretary; Julian Horcasitas, warden; G. O. Biles, conductor; Stone Mayes, T. B. Benjamin, and F. O. Smith, trustees. The grievance committee was composed of C. M. Gumfory, Martin Gallegos, J. I. Kemp, Henry Pearce, and L. J. Kennedy. J. I. Kemp, C. M. Gumfory, Art Gallegos, and John Hower were the most active in the organization of Local 63.

At the second election, the following were elected officers of Local 63: C. M. Gumfory, president; J. I. Kemp, secretary-treasurer; Juan Mendola, recording secretary. A short time thereafter, Martin Gallegos became president, Charles H. Rogers, financial secretary and treasurer, and Julian Caercetis, recording secretary. Ira J. Hicks was door conductor of Local 63. V. H. Crittenden solicited members for Local 63.

Julio Grado was president and Ismael Moreno was financial secretary and treasurer of Local 69.

Except as to alleged discrimination in regard to hire and tenure of employment, there was neither charge nor proof of any violation of the National Labor Relations Act.

The Board introduced evidence of the following statements made in 1934: Claude Danley, foreman, told Marcelo Avalos the union was not agreeable to petitioner and advised him to vote in favor of the company. A clerk in the company store also urged Avalos to withdraw from the union. Belford, a foreman, told Ira J. Hicks, "You fellows pay in to those white collared union guys and receive nothing from it and possibly will cause you trouble later on." Danley told Carlos Elvira not to vote for the union because "if we voted for the union the company would close down its work." Thorne asked Simon Sias why he was working for the union, and told Sias he did not have to work for the union, that the union was good but not in that camp and that the men did not need a union. Assistant superintendent Grissom advised Rafael Kirker to vote the proper way and told him the union would not help the Mexicans. These statements were all made prior to the enactment of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

The foremen at Santa Rita and Hurley were not authorized to employ men. Authority to employ and reemploy was vested solely in superintendent Thorne at Santa Rita and superintendent Hodges at Hurley.

Who were and were not members of Local 63 at Santa Rita was well known and who were and were not members of Local 69 at Hurley was well known. Membership in the Locals was a matter of common knowledge in each camp.

Prior to the organization of Local 63 at Santa Rita it was a peaceable and harmonious community. During the period of organization and the solicitation for membership in Local 63, bitter feelings were engendered between those employees who favored the union and those who were opposed to it. They formed separate groups and members of one group refused to associate with members of the other group. Friends of long standing took opposite sides and refused to speak to each other. Union men would not permit nonunion men to ride with them on conveyances to work.

While there was no labor controversy existing between petitioner and its employees, bitter feeling among the union men developed against petitioner. Many members of the union made threats to kill the officials, to drive the officials out of camp, to kidnap the children of officials, to wreck the trains, blow up the shops, bridges, and pipe lines, and burn the houses of petitioner, and otherwise sabotage its property. Rumors of these threats were general and persistent and permeated the entire population of the camp. Feeling grew

so high that guards were placed about the homes of officials, their children were guarded on the way to and from school, and the officials carried arms for their personal protection. Additional guards were also put on to protect property. Wives of nonunion men and of members of the management became terrorized.

The pastor of the Community Church testified that Dutch Stewart said to him, "they will meet our demands or we will wreck their trains, blow up their shops, burn their houses," and "get Tempest and Thorne," and that at a union meeting J. I. Kemp said, "if they don't give us our demands and our rights, there will be plenty happening" and that he would have a desk alongside of Tempest and would have a voice in the hiring and firing of men; that at the same meeting, Whitley, a union organizer, said, "Who was Sulley, who is Tempest, who is Thorne? Sulley is gone and we can put the other two with him pretty damn easy."[9] The pastor further testified that he heard Kemp say after the mine was closed, "They will open this place up again, we will make them and they will put every man Jack of you back to work. I would hate to think of what might happen to some of the families of these men if they go too far," and that Madden, a union man, said, "I just wish this morning we had 200 I. W. W. here, they would handle the situation."

Fred Stevenson, a nonunion man, testified that Kemp told him that if he did not join the union, his job was not worth anything; that they would run him out of camp; that the statement was made a dozen times to him; that Kemp, Claude Johnson, Gumfory, Stewart, and Martin were present; that prior to the shut down and after the shut down, houses were destroyed; that he worked on a shift at 700 well opposite the shift at which Kemp worked; that when he went to work following Kemp's shift, he found valves closed which should have been open and valves open which should have been closed, and that had he not made the discovery and corrected it, the machine would have blown up and killed him; that he found the valves left in that condition two or three times; that Ira Hicks opened the gates to a vacant property permitting the cattle to enter and destroy grass; that he protested to Hicks; that Hicks implied Stevenson had been sent there by petitioner and stated petition-

er would not have the chance to send him any more; that when Hicks moved out of his house, he padlocked the doors and two weeks later water was discovered running on to the hardwood floors from the sink, where the union under the sink had been loosened; that Kemp told him that no nonunion member would work in Santa Rita when the union was organized; that Stewart threatened to run him out of Santa Rita; that Gumfory told him his job would not be worth anything if he did not join the union; that Martin threatened him; that prior to the union organization, he and Hicks were friends and that after the union election, Hicks refused to speak to him; that Kemp, Stewart, and Claude Johnson threatened to run him out of camp and that he kept a shotgun at his home for protection.

Clarence H. Jones testified that while riding to work on a truck, Gus Gruwell and Vic Crittenden, two union men, told him only union men could ride on the truck; that he replied, "All right, slow down and I will get off," and that some one said, "Never mind slowing up, just push him off."

Fidencio Gonzales testified that Julio Viscarra solicited him to join the union and told him if he did not join he would have no work and that he and the officials would have to get out; that at a meeting when Jose Gonzales was present, the threat was made to kill Pluetarca Pedraca and Pablo Arreallano, and that there was a prevalent rumor that union members were going to kill Arreallano and Pedraca.

Ernesto Vargos said that union men solicited him to join and told him those who did not join the union would have to go down the road and leave camp.

Cruz Gomez testified that Stewart made a speech just before the election at Santa Rita, in which he stated if they would leave it to him to act as officer, he would form some trenches and execute the company officials; that 150 union men were present and manifested their approval of Stewart's statement by their applause.

Francisco Arrellano testified that Encarnacion Murillo told him that when the union went in they were going to throw out all the officials; that Felipe Huerta and one Orcacetas said it would be a good thing to blow up the pipe lines.

---

[9] General Manager Sulley died in 1933.

Pablo Orellano testified that Gumfory told him they were going to drive Tempest, Thorne, and Grissom out of camp.

Juan Serna testified that Simon Sias said they were going to get rid of Grissom; that Harvey Cooley told him, "You could cause the same old trouble that happened the other day in California. Some officers got killed there and you could have caused the same trouble."

Thorne testified that during the period of four or five months preceding the shut down, more equipment was broken than had occurred in the entire previous operation of the property; that he found switches cocked open six times during the period of five months preceding the shut down, and that no switches had been left open during the previous operation of the property.

Boyd testified that it was the policy of petitioner to make no discrimination on account of union affiliation, religion, or politics and that when the campaign to obtain membership for Local 63 was inaugurated in 1934, he instructed the management at Santa Rita to do nothing to interfere with the men, but to leave them free to exercise their choice to join or not join the union; that petitioner cooperated with the old National Labor Relations Board in holding the elections at Santa Rita and Hurley;[10] that when the petitioner decided to reopen the mine in 1937, he had a conversation with Tempest relative to rehiring of former employees; that Santa Rita was a small community in the hills, and that it was necessary for the people to get along with each other; that it was intolerable to have half of the population in fear of the other half; that he instructed Tempest to refuse employment to any former employee who had been guilty of destroying company property, threatening officials and other employees with violence, or manifesting sympathy for such action; that Tempest was best informed of any person to determine what individuals should be denied employment on such grounds; that Tempest instructed Thorne and Hodges as to who were not to be reemployed on those grounds; that otherwise, Thorne and Hodges were free to hire whomsoever they chose.

Thorne testified that Tempest gave him a list of former employees who were not to be reemployed. He identified on the union list 114 former employees who were on the Tempest list. Thorne's brother was on the list. He also gave the names of fourteen employees who were on the Tempest list, who were not members of Local 63 or 69. He further testified that no one was denied reemployment because of union activity or affiliation, and that union affiliation was not considered in determining who should be reemployed.

The principal question presented is whether the evidence supports the findings of the Board with respect to the motivating cause of petitioner's refusal to reemploy certain former employees. If the reason given by Boyd in his testimony under oath was a reasonable one, the onus was upon the Board to establish the falsity of his explanation and that the motivating reason was union affiliation.[11]

It was not sufficient for the Board to show that employment may have been refused on account of membership in Local 63 and Local 69 and of union activities. If the refusal to reemploy may have been one of two things, one illegal and the other legal, the fact-finding tribunal may not guess or speculate as between the two causes. There must be satisfactory foundation in the evidence to support its conclusion. When the evidence is consistent with either of two inconsistent hypotheses, it establishes neither.[12]

Furthermore, it was not essential that petitioner establish that the grounds upon which it refused reemployment actually existed. It is sufficient if petitioner in good faith reasonably believed they existed.[13]

The relation of employer and employee between petitioner and those denied reemployment ceased in September, 1934. It was then believed that the shut down would be of long duration. "The act does not interfere with the normal exercise

[10] The latter statement was verified by letters from the old Board.

[11] Martel Mills Corporation v. National Labor Relations Board, 4 Cir., 114 F.2d 624, 631.

[12] Bussmann Mfg. Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 783, 787; Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 106 F.2d 100, 114; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.

[13] National Labor Relations Board v. Vincennes Steel Corporation, 7 Cir., 117 F.2d 169, 173.

of the right of the employer to select its employees." The employer may not, under cover of that right, deny employment for the purpose of discouraging membership in a union. On the other hand, the Board may not make its authority a pretext for interference with the normal exercise by the employer of its right to select its employees.[14] Petitioner had the right to deny reemployment for any reason which it believed sufficient so long as the cause of such denial was not union affiliation.[15] Here, the reason asserted was neither fanciful nor unsubstantial and did not challenge the good faith of Tempest.

■■ Prior to the enactment of the National Labor Relations Act and the shut down in September, 1934, the petitioner had sponsored a local representative plan and there were isolated instances where superintendent Thorne and certain foremen had expressed opposition to Local 63. But prior to the enactment of the National Labor Relations Act, a representative plan of organization was lawful and we know of no law that then inhibited an employer from expressing to his employees his opposition to one form of union organization and his preference for another, since § 7(a) of the National Industrial Recovery Act, 48 Stat. 198, lacking constitutionality, was void. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. Furthermore, such statements were isolated, were made in casual conversation with fellow employees, and were not authorized or encouraged by Boyd or Tempest, or even known to them, and were contrary to Boyd's specific instructions. They should not be imputed to petitioner.[16] Boyd testified that it was the policy of petitioner to make no discrimination on account of union affiliation and that when the campaign to obtain membership for Local 63 was inaugurated, he instructed the management at Santa Rita to do nothing to interfere with the men, but to leave them free to exercise their choice to join or not to join; and the Regional Labor Board found that there had been no interference, restraint, or coercion exercised by petitioner respecting membership in Local 63. The evidence of the statements of Thorne and the foremen, at most, warrants the conclusion that Thorne and the foremen preferred the representative plan to Local 63.

Thorne testified that he denied reemployment to no person on account of union affiliation or activity and that he reemployed men unless they were on the Tempest list, or unless grounds other than union affiliation or activity existed for denying employment.

There was testimony that certain foremen had stated that old employees who had been members of Local 63 or Local 69 would not be reemployed. This was manifestly untrue. At Santa Rita in February, 1937, 107 old employees had been reemployed, 32 of whom were members of Local 63, and 75 of whom were not members; in April, 1938, 102 old employees had been reemployed, 37 of whom were members of Local 63, and 65 of whom were not members; and in December, 1939, 130 old employees had been reemployed, 57 of whom were members of Local 63, and 73 of whom were not members. At Hurley, in February, 1937, 74 old employees had been reemployed, of whom 18 were members of Local 69, and 56 were not members; in April, 1938, 68 old employees had been reemployed, of whom 25 were members of Local 69, and 43 were not members; and in December, 1939, 90 old employees had been reemployed, of whom 39 were members of Local 69, and 51 were not members. Furthermore, there were employed at Santa Rita, 15 members of Local 63 in February, 1937, 13 in April, 1938, and 29 in December, 1939, who were not on the September, 1934 payroll, and there were employed at Hurley 12 members of Local 69 in February, 1937, April, 1938, and December, 1939, who were not on the September, 1934 payroll. These uncontroverted facts demonstrate the statements were untrue and did not correctly manifest petitioner's policy.

---

[14] National Labor Relations Board v. Jones & Laughlin, 301 U.S. 1, 45, 57 S. Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Boss Mfg. Co., 7 Cir., 107 F.2d 574, 579.

[15] National Labor Relations Board v. Automotive M. Mach. Co., 7 Cir., 116 F. 2d 350, 354; Phelps Dodge Corp. v. National Labor Relations Board, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217, decided April 28, 1941.

[16] See National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 479; E. I. Du Pont De Nemours & Co. v. National Labor Relations Board, 4 Cir., 116 F.2d 388, 400; Quaker State Oil Refg. Corp. v. National Labor Relations Board, 3 Cir., 119 F.2d 631, 633.

Thorne identified 114 members of Local 63 who were on the Tempest list and 14 nonmembers who were on such list. No doubt, the list contained other members of Local 63 whom Thorne was unable to recall. Boyd testified that he delegated to Tempest the duty of making a list of former employees who had destroyed petitioner's property, who had threatened the lives of Tempest, Thorne, and Grissom and the safety of their children, and who had advocated or threatened the destruction of petitioner's property, or who had encouraged or manifested approval thereof.

■ While the proof directly connected only a few members of the union with the acts of violence and threats, it established that at least 150 of the members sympathized with and approved the acts of violence and threats. Furthermore, it was not incumbent upon petitioner to establish that the men on the Tempest list had actually engaged in sabotage, violence, threats thereof, or encouraged or abetted such conduct. It is sufficient if Tempest, in making up the list, acted in the honest belief that the men placed on the list were within that category and denied reemployment for those reasons. In doing so he exercised the normal right of petitioner to select its employees.[17]

Notwithstanding no grievance existed against petitioner, and no labor dispute or controversy was then pending, serious acts of sabotage took place. Thorne testified that there was more breakage in machinery and equipment in the four months preceding the shut down in September, 1934, than had occurred during the previous twenty odd years of petitioner's operations; that switches were left cocked open; and that valves were left open, and, had such condition not been discovered, through the alertness and loyalty of other employees, a serious explosion would have resulted causing great destruction of life and property. The situation at Santa Rita became one of terror. Rumors of threatened violence were persistent and permeated the whole population of the camp, men and women lived in constant fear, guards were placed about the homes of officials, additional guards were put on to protect petitioner's property, children of officials were guarded to and from school because of threats of kidnapping, nonunion men armed themselves for their own protection, and members of the management carried arms, fearful that violence might break out any minute. It may be that Tempest resolved doubts in favor of the petitioner and included men on the list who should not have been included. But it is reasonably to be expected that one who had gone through what Tempest had experienced, would resolve doubts against the employees and in favor of petitioner, and he had the right so to do. The relation of employer and employee had ceased and no legal obligation to reemploy anyone existed. It would be the normal thing for one in Tempest's situation to deny reemployment to all whom he thought might have participated in or encouraged such acts of violence and threats. That the evidence did not establish that all the men on the Tempest list were guilty of sabotage, threats, or incitement thereof does not adversely reflect on the good faith of Tempest.

That Tempest did not include men on the list because of their union affiliation or activity is further indicated by the fact that notwithstanding he knew who were and were not members of the union,[18] he included 14 nonunion men on the list, among them superintendent Thorne's brother, and substantial numbers of union men were reemployed.

On the one hand, we have the testimony that most of the men on the Tempest list were members of Local 63; that large numbers of members of Local 63 and Local 69 were denied reemployment; that foremen stated reemployment would be denied to members of the two Locals; and that Thorne and certain foremen in 1934 manifested a preference for the representative plan of organization as against the affiliated unions. On the other hand, we have the testimony of acts of sabotage and of destruction of petitioner's property, of efforts to destroy the same, and of threats against officials, their children, and petitioner's property, which created a state of fear and terror throughout Santa Rita, a situation not engendered by any labor dispute between petitioner and its employees, but one which developed because of a sharp division among the employees themselves, respecting the desirability of joining the affiliated union. We have the testimony of

---

[17] National Labor Relations Board v. Fansteel Met. Corp., 306 U.S. 240, 59 S. Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

[18] The evidence of the Board was to the effect that nonunion men and union men divided into separate groups; and that it was well known who were members and who were not members of the two Locals.

598

Boyd that it was the policy of petitioner not to interfere with the employees with respect to their choice of union affiliation, nor to discriminate against them on account thereof, and that the motive of petitioner, in making up the Tempest list, was to prevent the reemployment of those who had engaged in acts of sabotage, destruction of property, and threats of violence against persons and property, or of inciting or encouraging such acts and threats. We have the evidence that substantial numbers of old employees who were members of Local 63 or Local 69 were reemployed. And we have the testimony of Thorne that in determining who should be reemployed, union affiliation was in no wise considered.

We think the petitioner's explanation of the reasons which motivated its action in denying reemployment is a reasonable one under the facts and circumstances, and hold that the onus was on the Board to establish the falsity thereof. We think it is more reasonable to infer from the evidence that the motivating cause was the one asserted by the petitioner, rather than the one found by the Board. But if we mistake in this, we think the most that can be said is that the evidence adduced leaves the matter in the realm of speculation and that it is as reasonable to infer therefrom that the motivating cause was that asserted by petitioner, as to infer that it was because of union affiliation or activity. If the evidence was as consistent with the hypothesis asserted by petitioner as the one upon which the Board predicated its order, it established neither.

We, therefore, conclude that the findings of the Board are not supported by substantial evidence and that the order should not be enforced. Enforcement is, therefore, denied.

BRATTON, Circuit Judge (dissenting).

The National Labor Relations Act, approved July 5, 1935, 49 Stat. 449, vests in the National Labor Relations Board, not the courts, the function of drawing inferences from established facts and circumstances, of appraising conflicting evidence, of determining the credibility of witnesses and the weight to be given to their testimony, and of resolving issues of fact. And when the findings of the Board are supported by substantial evidence they cannot be overturned on review. National Labor Relations Board v. Waterman Steamship Corporation, 309 U.S. 206, 60 S.Ct. 493, 84 L. Ed. 704; National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 61 S. Ct. 358, 85 L.Ed. 368; Continental Oil Company v. National Labor Relations Board, 10 Cir., 113 F.2d 473; Magnolia Petroleum Company v. National Labor Relations Board, 10 Cir., 115 F.2d 1007; Cudahy Packing Company v. National Labor Relations Board, 10 Cir., 118 F.2d 295; National Labor Relations Board v. Moore-Lowry Flour Mills Company, 10 Cir., 122 F.2d 419, decided July 17, last.

It is unnecessary to repeat or supplement the outline of the evidence contained in the opinion of the majority. It is enough to say that in my opinion the evidence to which the Board was warranted in giving credence and the inferences which the Board was warranted in drawing from such evidence adequately support the material and decisive findings of the Board, and that the order should therefore be enforced.