## NATIONAL LABOR RELATIONS BOARD v. JAHN & OLLIER ENGRAVING CO.
### No. 7621.

Circuit Court of Appeals, Seventh Circuit.
Nov. 26, 1941.

Robert B. Watts, National Labor Relations Board, of Washington, D. C., I. S. Dorfman, N. L. R. B., of Chicago, Ill., and A. Norman Somers, N. L. R. B., of Washington, D. C., for petitioner.

David R. Clarke, John Harrington, and Albert J. Smith, all of Chicago, Ill., for respondent.

Before SPARKS, and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioner prays enforcement of its order finding that respondent had violated Section 8(1) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., by various antiunion statements and activities of its officials and supervisory employees, by offering to its employees an individual profit-sharing contract and by posting certain notices; and directing that respondent cease and desist from these unfair labor practices and from continuing and enforcing its profit-sharing contract and, affirma-

tively, that it notify each of its employees that the contract imposed a restraint upon them in the exercise of their rights and that, therefore, respondent would cease and desist from enforcing the same. We are confronted by no question of a company dominated union or of discriminatory charges. The issue is whether the Board's findings in the respect mentioned are supported by substantial evidence.

From 1905 to 1937 the employees were not members of any union; respondent's was an open shop. In 1937 union representatives attempted to organize the plant and within some eighteen months succeeded in enlisting a substantial number of the employees. On August 17, 1937, respondent posted "A Message to Employees— Facts about the Wagner Act." The information contained in the notice was largely of negative character setting forth what the act did not require to be done rather than its affirmative provisions. It advised employees that they were not required to join unions or seek collective bargaining and emphasized rather than benefits employees could hope to acquire through a union, those which would not result from membership in such a body. The Board found that the message was calculated to advise employees that from unionization they might expect neither the protection the act affords nor the advantages of collective bargaining which the act encourages.

In 1938 the respondent's president, Boothby, invited the employees to a number of meetings at which he announced that there had been no change in the policy of the company since the act had gone into effect and would be none in the future; that the company would close its doors before signing a closed shop contract. He contrasted union officials, whom, he said, "don't want you, but want your dues," with respondent's representatives whom he described as "honest business men trying to give the employees a square deal." The Chairman of the Board of Directors warned employees to be wary of "poison peddlers" and of "poison propaganda that was hurting the shop." He said that "the union officials are only in it for what they are getting out of it." Boothby talked to employee Doland, in his office, questioning the latter about his union membership and activity, warning him that he, Boothby, had been advised that Doland was a member of the union and referring to other active union employees as "smart agitators," who were "not kidding anybody." Doland replied that he had "knocked out more than the amount of work" expected of him and Boothby replied that his work was immaterial as long as he was with the company and did not "stick a knife in their back." The president questioned various employees about union affiliations. Superintendent Ross called to his office employee Barrier, and asked about his union affiliations. Barrier answered that he was not a member but might become one. Ross replied "you know you have a family * * * if you go to work in a union shop you will have to prove yourself * * * we let you get away with stuff here."

In addition various employees who were foremen but had no right to employ or discharge employees made similar statements to the workmen. Early in 1938 the foreman of the half-tone department asked an employee to demonstrate his loyalty by keeping the foreman posted on union activities. The employee refused. Another foreman, Albin, having been informed that a workman had been visited by a union organizer, said to him, "don't have any part of those fellows * * * don't leave them get in your life and ruin your life." This foreman testified that he might have told various employees that he disapproved of the union. Another foreman told employee Paul that the company didn't "know whether" it "can trust you, whether you are going to keep on organizing or not" and, on another occasion, that respondent "didn't care whether the union could pull men out of there or not, because * * * they can always farm" its "work out." Foreman Klein testified that he advised the employees that "you know what you got here, and you don't know what you are going to get * * * I don't believe in the union myself * * * I think you should stay with the firm." The same foreman questioned another employee as to union affiliations and, upon his refusal to give information, said "never mind, we know, or we can find out if you are a union man or not."

To this and similar testimony, some of which was sharply controverted, the Board gave credence, resolving all conflicts in favor of the witnesses for the Board and, upon these facts, found that respondent had violated Section 8(1) of the Act by various antiunion statements and activities of its officials and supervisory employees.

But the Board found further evidence of unfair practices in the profit-sharing contract submitted by respondent to its employees. On July 15, 1938, the president called groups of employees to a series of meetings at which he read the prepared contract and requested the employees to sign. All but one signed, that one stating: "I was afraid to stay behind. I didn't want Mr. Boothby to know I was in favor of the union." Copies of the contract were not distributed. The agreement contained a recital of existing working conditions and provided that they were to remain in force for two years. Respondent bound itself to furnish employment under existing conditions and to give the employees a share of the profits under certain specified circumstances. The provisions, the examiner found, were very favorable to the employees, so favorable that little difficulty was experienced in procuring signatures. The employees agreed "to give loyal, skillful, continuous, uninterrupted service satisfactory to said corporation 52 weeks per year for two years under existing conditions and rates of compensation." If they broke the contract they were subject to immediate discharge. In the event of a strike they forfeited their rights under the contract and as employees. These provisions the Board believed "precluded the workmen from exercising their rights guaranteed by the Act for a period of two years. During that period collective bargaining was foreclosed."

The Board found also that respondent interfered with an election of the employees. The parties agreed in November, 1938, that "a consent election" be conducted on November 30 and December 1. On the day the election was agreed upon, respondent for the first time posted the profit-sharing contract on the bulletin board. The foremen became active. Foreman Klein more than once within two weeks preceding the election warned employees of the high union dues that they might have to pay. He and another foreman talked of loss of jobs which would follow in the event of union installation. Klein indicated a probable substantial raise in wages to one employee if he could be depended upon not to "keep on organizing." Foreman Zemke inquired of another as to whether he had attended a union meeting and told him that if a union representative came to his home "to send him away and stick with the company," assuring him that "you always win in the long run if you

stick with the company." He also questioned the employee the day before and immediately after the election, at which the union was defeated 77 to 49, as to his vote.

Respondent notified the foremen on November 22 in writing "not to say or do anything with our employees which might be construed by the Board as coercion, intimidation, or interference with the efforts of Chicago Photo Engravers' Union to unionize our men." But the Board believed that respondent condoned such utterances in the language that "any enthusiastic and well meant attempts along that line on the part of loyal foremen might prove embarrassing to the firm."

After the election, the president repeated that "before they turned Union they would close the shop." He referred to Frank Rastetter, a new employee, calling attention to the fact that the company had closed down its Toledo plant where Rastetter had been employed, when threatened with unionization. He asked the employee to tell his fellow employees of the "troubles that you had in Pittsburgh and how the union treated you." Soon thereafter he told Rastetter not to be concerned by union circulars because "they have been sending those for the last 30 years," and increased the employee's wages.

On January 23, 1940, after the complaint had been filed, before the hearing began, respondent posted a notice on its bulletin board stating that the proceedings might be pending for a long time, "maybe for several years, but their pendency will in no way interfere with" the continuation of "respondent's policies or" its "relationship with" its "employees."

■ Much of the parol evidence was controverted but with the interpretation of the facts by the Board we have no concern except to inquire as to whether there is substantial evidence to support the findings. All questions of credibility and which of two reasonable inferences may be drawn from the evidence are for the administrative body.

■ It seems obvious from consideration of such facts as the Board believed established that the order was fully justified. Applying to union members such terms as poison peddlers, agitators and propagandists, questioning employees concerning their union membership and activities, threatening a plant shutdown and

individual loss of employment if the union should succeed and influencing employees to vote against the union in the election are not indicative of that degree of neutrality and impartiality imposed upon employers by the act. Whatever may have been the humanitarian viewpoint of respondent, to whatever degree it may have attempted as an employer to deal generously with its employees as fellow human beings, to whatever extent it had in good faith endeavored to extend to them liberal sharing of profits are wholly irrelevant in the discharge of our legitimate function of determining whether there has been error of law in the Board's decision that the employees were hampered by their employer in their right to enjoy free and independent selection of a bargaining agent, wholly void of employer's influence, whether that influence be good or bad, depending upon the point of view.

◼◼◼◼ The question at issue is not so much one of praiseworthy intent on the part of employer toward employee but rather the inquiry of whether the standard set by this act, not in remedying personal ills but in promoting the public welfare, the standard of free and independent action, uninfluenced by employer influence, exists. The evidence is such that we are not justified as a matter of law in saying that the Board erred in finding that the employees were not left to enjoy freely and independently their rights guaranteed by the act.

◼◼◼◼ The Board considered not only the actions and statements of executive officers but also those of certain foremen who were eligible to the union and who, in fact, under the by-laws of the union, were compelled to become members if it were established. These employees had no power to employ or to discharge and respondent insists that it had requested them not to interfere and that what they did was nothing other than their voluntary action. The situation is closely akin to that in International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50. There the men were not foremen or even supervisors with executive or directorial functions, but merely lead men who, by reason of long experience, were skilled in handling new jobs and hence directed the set-up of the work. The Board had as much justification in the facts here as it had in that case to believe that the foremen did exercise some authority over the employees and were in a strategic position to translate to their subordinates the policies and desires of the management. Irrespective of this, however, the actions and statements of respondent's executive officers were sufficient to support the order.

◼◼◼◼ Respondent protests that the liberal profit-sharing contract is in no wise illegal. No doubt a profit-sharing contract, if entered into in "the utmost good faith, and without interference with, or restraint upon, the rights of the employee as guaranteed by the Act," is entirely proper. N. L. R. B. v. Vincennes Steel Corp., 7 Cir., 117 F.2d 169, 172; N. L. R. B. v. Superior Tanning Co., 7 Cir., 117 F.2d 881. Here the contract created nothing new. It appeared at the time when the union was attempting to organize and was given publicity at the time when the union was asking for an election. More than that, by it the employees agreed to render uninterrupted service for two years. Breach of this provision was to result in discharge. All this the Board believed justified a finding that the employees had foreclosed themselves of the right to engage in collective bargaining for a period of two years and had agreed not to strike during that period. We think the contract is not to be distinguished in kind and effect, but only in degree, from that in National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 575, 84 L.Ed. 799, where the court said: "The contracts * * * were the means adopted to 'eliminate the Union as the collective bargaining agency of its employees.' We think it plain also that by their terms they imposed illegal restraints upon the employees' rights to organize and bargain collectively guaranteed by Sections 7 and 8 of the Act [29 U.S.C.A. §§ 157, 158]." See also N. L. R. B. v. Vincennes Steel Corp., 7 Cir., 117 F.2d 169; N. L. R. B. v. Superior Tanning Co., 7 Cir., 117 F.2d 881.

The order will be enforced.