### WILSON & CO., Inc., v. NATIONAL LABOR RELATIONS BOARD.

Nos. 496, 497.

Circuit Court of Appeals, Eighth Circuit.

Nov. 10, 1941.

Rehearing Denied Nov. 29, 1941.

412

Paul Ware, of Chicago, Ill. (James D. Cooney and Richard C. Winkler, both of Chicago, Ill., on the brief), for petitioner.

Helen F. Humphrey, of Washington, D. C., Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Morris P. Glushien, Samuel Edes, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

This matter is before us upon two petitions filed by Wilson & Co., Inc., to review and set aside two orders of the National Labor Relations Board. In its answer to the petition, the Board requests enforcement of the orders. In each of these cases the Board has found the petitioner guilty of certain unfair labor practices, (1) in dominating and interfering with and in supporting a local labor organization known in the record as the Club and (2) in discriminating against certain employees because of their union affiliations or activities. The orders of the Board require petitioner (1) to withdraw recognition from and to disestablish the Club as a collective bargaining representative of the employees; (2) to offer reinstatement and back pay and restore seniority and other rights to certain employees, and (3) to post appropriate notices.

Petitioner seeks review of these orders and asks that they be set aside as not sustained by substantial evidence. Respondent, on the other hand, requests enforcement of the orders as entered by the Board. We shall first consider the findings of the Board to the effect that petitioner dominated and interfered with the formation and administration of the Club and had contributed support to it in violation of Section 8(1) and (2) of the National Labor Relations Act, 29 U.S.C.A. § 158(1,2).

█ Petitioner operates a produce plant at Faribault, Minnesota, a city of about 14,000 population. The plant was acquired in 1934 but shortly thereafter was closed by a strike called by the Independent Union of All Workers and was not reopened until the spring of 1935. The plant handles poultry and eggs produced in the area tributary to Faribault and processes butter which it purchases in bulk from creameries in Minnesota. It employs irregularly, because of the nature of the business, from 26 to 197 workmen during the year. Following labor agitations involving threats and violence initiated in 1934 by the Independent Union of All Workers, the plant was closed. Some 15,000 head of poultry in the plant when the strike was called had to be fed and watered by the county attorney, and all representatives of the petitioner were excluded from its property. The plant remained closed until the spring of 1935, when it reopened. In the fall of 1937, the C. I. O. renewed labor organization activities and some of petitioner's employees organized Local Union 216. Outside organizers called upon the management, claiming to represent petitioner's employees, and petitioner began bargaining and meeting representative employees. There followed a period of attempted organization by the employees, with threats to again close the plant with strikes and threats of physical violence toward those employees who did not join the C. I. O. About December 9, 1937, some of the employees commenced the organization of an unaffiliated union of petitioner's employees in opposition to Local 216, which was permitted to intervene at the hearing before the examiner. It was this Club which the Board found to be company dominated. Referring to the efforts of Local Union 216 to organize the employees, the general foreman in December, 1937, reported to the manager that there was trouble brewing. The plant foreman reported to the manager that various workers were attempting to organize the C. I. O. and gave him the names of the employees who were so engaged.

In the final analysis, the question of domination and interference in the formation of the Employees' Club is dependent upon the status of certain employees, notably Russell Woods, Andy O'Brien, C. J. St. Martin, Bessie Rauchert and Fred Allison. Woods and O'Brien consulted local attorney Thomas Quinn and secured from him certain documents which had been prepared for an unaffiliated organization contemplated during the 1934 strike to oppose the Independent Union of All Workers. These papers were taken to the office of another attorney, who recast them so as to make them applicable to the Club. Among these documents was a petition for the establishment of the Club. This petition was circulated among the employees on company time and on company premises. St. Martin solicited employees under

him to sign the petition. Rauchert arranged for the 25 employees under her to leave their work one by one and go to the dressing room during working hours, where she personally procured their signatures to the petition. These parties, Woods, O'Brien, St. Martin, Rauchert and Allison themselves signed the membership roll and served as officers, Allison acting as temporary chairman of the Club, and O'Brien later served as president.

It is contended by the petitioner that these employees were ordinary workmen without authority over their fellow employees and without power to employ or discharge employees, or otherwise to represent petitioner. Russell Woods did not become plant superintendent until the middle of 1938. Before that time he was employed in the chicken-picking room. When he became plant superintendent, he withdrew from the Club. Before becoming plant superintendent, the character of his duties and the extent of his authority are difficult of determination because it is not always possible to determine whether the witness is speaking of his duties prior to his promotion or subsequent thereto. It is pointed out by the Board that rates of pay were higher for all these named persons and their employment was steady. One witness testified that: "They had the right to tell us what to do and how to do it." In any event, they instructed new employees, they repeated instructions received from the superintendent to other employees, and they kept track of the time the various employees worked. They recommended and advised the superintendent concerning hiring and discharging employees. The plant superintendent testified that these men supervised the work in their particular departments. They were charged with responsibility for maintaining discipline and instructing new employees. To be sure, most of their work was manual. These facts were, we think, sufficient to sustain the finding of dominance of the Club through the activities of these persons. International Association of Machinists et al. v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368; Eagle-Picher Mining & Smelting Co. v. N.L.R.B., 8 Cir., 119 F.2d 903.

The Board's finding of domination and interference being supported by substantial evidence, it follows that the orders to withdraw recognition from and to disestablish the Club as a bargaining representative of the employees must be sustained.

As to that part of the orders based upon the findings that petitioner had discriminatorily refused to reinstate certain employees, we find it necessary to consider each of these employees separately or in groups. Certain basic facts with reference to the nature and characteristics of petitioner's business must be considered in connection with each of these individuals.

The produce business, such as was carried on by petitioner at Faribault, is highly seasonal and fluctuating. It is impossible to know from day to day, or from week to week, or from year to year, the quantity of live produce or raw material that will probably be available, and all employees are therefore on an hourly basis. Employment of necessity fluctuates from day to day. The organization force consists of a manager, whose primary duties are connected with the procurement of the product from the farmers, and a superintendent or general foreman, who is responsible for the plant operations, including the responsibility of employing and laying off the plant workers. Egg receipts commence in March because the hens start laying then, and continue in volume until June, when the hens practically cease laying. The egg operations consist of candling and grading the eggs as received, and packing them for shipment. Butter is purchased in bulk from creameries in Minnesota and graded, placed in consumer packages and packed into cartons. This work, though less seasonal than poultry and eggs, is greater in the summer months than the balance of the season. Poultry in quantity is usually marketed from June until Fall, and turkey packing begins just before Thanksgiving and ends at Christmas time. The fowl when purchased are placed in feeding batteries and are fed until ready for market. They are then slaughtered and moved to packing rooms where they are graded.

It is established by the evidence without dispute that the produce business is in a state of continual fluctuation and that employment of necessity likewise fluctuates widely. Raw materials and live products are perishable and must be handled, processed and sold promptly and efficiently in highly competitive markets. The nature of petitioner's business was such that a

system of seniority in hiring and discharging employees could not be followed. The volume of work depended on the volume of receipts of produce and as sufficient volume was obtained, the superintendent would select help and would attempt to secure the best obtainable help. During the rush season there might be more applications at the plant than jobs. Thus, during the years 1936, 1937 and 1938 the employment at the Faribault plant fluctuated from 26 to 197 employees. In the slack seasons there were about 7 or 8 steady male employees and about 18 steady female employees, ten of whom worked in the butter department. None of the individuals involved in orders of the Board as having been discriminatorily treated was a steady employee. Most of the additional employees were women, married, or single girls living at home who desired to increase the family income.

The work at the plant in 1937 was exceptionally heavy, that being a year of unusually heavy egg production. In April and May of that year it was necessary to work in two shifts, one during the day and one at night, and it was difficult to obtain sufficient number of workers. Help was solicited by newspaper advertisement. The production and need for employees in 1938 diminished, and in that year ranged from 26 in February to 82 in September. From 1934 through 1938 it was the practice to lay off employees who were no longer needed at the close of the various seasons throughout the year. The employees thus laid off were taken off the plant's payroll, and they took home their clothing and personal equipment at such times. Prior to the winter of 1937–1938, it had been the practice whenever there was a small amount of work such as chicken picking, to send out a general call for workers and hire as many as needed. Because of the small amount of produce on hand, those who were called frequently did not have more than a few hours work each week, and numerous employees complained that it was not worth their while to come to the plant under such circumstances as the amount received did not compensate them for their efforts. To meet this objection, and to save accounting, after the Christmas season of 1937 petitioner adopted the plan of having this work done by a small group of employees who worked continuously in the plant, and who were capable of working in all departments. It had not been unusual during the years 1934 to 1938 for petitioner

in selecting employees during the rush season to pick new applicants in preference to former workers at the plant, and when such employees were laid off at the close of a particular season, they would take home their clothing and personal equipment. At the end of the poultry season in December, 1937, a reduction in force became necessary. The Board found that the refusal to rehire was occasioned by union membership. With this background, we consider each individual case.

█ Mrs. Ellen Chappius was hired in the latter part of October, 1937, and worked in the chicken picking department until December 22, 1937. This was the only time she had ever worked in a poultry house. On July 5, 1938, she went to the plant and applied for work. She testified that the superintendent told her he had a full crew and would call her when he needed her. On October 28, 1938, just before the turkey season opened, she received a call from the superintendent requesting her to come to work, but on October 8, 1938, she had moved on a farm and did not care to work for petitioner after that time. The superintendent testified that he did not know that she was a member of the C.I.O. The Board did not order petitioner to offer employment to Mrs. Chappius but ordered petitioner to make her whole for any loss of pay which she might have suffered by reason of petitioner's discrimination against her, by paying her a sum of money which she would normally have earned as wages from July 8, 1938, to the date of the offer of reinstatement, less her net earnings during that period. The Board found that, "Following arrangements made one or two months previously, Chappius moved to a farm on October 8, 1938. About October 28, 1938, she received by mail a note from the respondent and signed by Woods as follows: 'Please report for work as soon as possible if you care to work.' Woods explained that he had not rehired Chappius because he did not consider her a good worker and also suggested that the respondent had not reinstated her because of her slight weight. Her work was never criticized. The respondent's subsequent efforts to reinstate her indicate that she was a satisfactory employee and showed that it attached no importance to her weight. As noted above, by July, 1938, the respondent had hired 39 additional employees. Thereafter, it also hired six inexperienced pickers. Under the circumstances, and in view

of all the evidence, we do not credit the respondent's explanation for its refusal to offer her reinstatement prior to October 28. We think that the respondent refused to reinstate her because of her union activity."

There was evidence that she was a member of Local Union 216; that she had openly worn the union buttons at work. When she first applied for employment she was told that she was "not on the list." We are of the view that the Board, under the facts and circumstances, might have inferred, as it did, that the offer to re-employ in October indicated that her work was not unsatisfactory, and that respondent's failure to reinstate her earlier was because of her union activities.

Edwin C. Weishaar was employed as a poultry picker in 1935, from June to December, again from June to November in 1936, when he quit, and from June to December in 1937. The Board ordered that he be offered employment with back pay from July 8, 1938. He made no application for work in June or July, which was the season during which he had previously been hired, but went to the plant in January. He testified that he asked the manager of the produce department for work and that the manager said "that he would call all the older help back first, that we would not have to worry. He said there might not be work until March, probably July, but when there would be work, we would be called back in order." He too had membership in the C.I.O., wore his button, and was openly a union man. He was not called. While there is testimony to the effect that his work was not satisfactory, the Board, however, believed his testimony to the effect that he had been assured that he would be recalled, and his testimony is sufficient in connection with other evidence that newer and less experienced workers were hired, to sustain the Board's finding that in not recalling him he was discriminated against because of his C.I.O. membership, and that he was not an unsatisfactory worker. The Board's order as to him is therefore sustained.

Lillian Jeno was employed as a poultry picker from July 6 to December 22, 1937, when the general layoff occurred. She applied for work in the middle of February, 1938, asking for a job in the egg breaking department, where she had never worked before and with which she had had no experience. She testified that she talked with the superintendent and was told that she would have as good a chance as any of them, "that he would let me know when they started." The Board ordered her reinstated as of July 8, 1938, and that she be made whole for any loss of pay she would have normally earned from July 8, 1938, to the date of offer of employment. She testified that when she applied for employment in February, 1938, the superintendent told her that she would have as good a chance as any of them and that he would let her know when they started. No one called her back, although other inexperienced help was employed. She was a member of the C.I.O. and wore the C.I.O. button on her uniform at work. Failing to call her after having promised to do so, with the other circumstances which the Board had before it, warranted, we think, the finding of discrimination because of her union affiliations.

■ Margaret Kolterman, Ann St. Martin, Marie Chavie, Effie Summers, Pearl Summers, Laverne Hensel, Ruby Hagen and Alfred Christensen will be considered as a group. They were all members of the C.I.O. Union 216, and had been active in organizing that union. They were all employees, acknowledged to be "good workers," and each of them was laid off in December, 1937, when they were told that they would later be recalled. It was admitted by the superintendent that they had not been re-employed, as was the custom of petitioner, when there was employment for them, but in many instances inexperienced people were employed in their stead. The Board found that petitioner's failure to reinstate these employees was discriminatory. Petitioner seeks to excuse the acknowledged discrimination because of the exigencies of the situation presented by the bitter feeling that these employees had engendered in their dispute with the members of the local Club. The superintendent in his testimony, after admitting that these individuals had been satisfactory employees, and after having admitted that they had not been reemployed in accordance with the usual custom of petitioner, was asked to explain why they had not been recalled for work. He testified as follows:

"They (this group) organized a union down there that fall (1937). There was about, as near as I can recollect, perhaps 25 or 30 of the people working there that joined. I don't think that any more than that had joined the C.I.O. organization. There was at that time, approximately, I

would say, around 75 or 80 people that they could get to join the union.

"They used such coercion, such threats, tried to intimidate the other employees, and used such abuse that there was a personal feeling against these people so that in order to keep peace in the plant and to keep the other folks from going out on strike, because they refused to work with them, that I didn't rehire them."

The witness again in his testimony said: "My reason for not rehiring them back, which I stated very plainly, was due to the abuse, the threats and intimidation that they put on the people that didn't believe as they believed. There was a personal feeling down in the plant that the other people refused to work with them and in order to keep peace in the plant I didn't dare hire them back until there was a different feeling towards them."

Two only of this group have since been employed—Margaret Kolterman and Ann St. Martin, about October 1, 1938—although inexperienced help with no union connections were in the meantime employed. It was also admitted by the superintendent that the re-employment of these two caused no disturbance of any kind among the employees. The Board did not credit the explanation given and it here contends that if it be accepted as established in fact, it was not sufficient as a matter of law to warrant the discrimination.

Section 7 of the Act, 29 U.S.C.A. § 157, provides that, "Employees shall have the right to self-organization, to form, join, or assist labor organizations * * *."

Section 8, 29 U.S.C.A. § 158, provides that, "It shall be an unfair labor practice for an employer * * * (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

Section 10 (a), 29 U.S.C.A. § 160 (a), provides: "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice * * * affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

Section 10 (c) provides that if the Board shall be of the opinion that any person is engaged in unfair labor practice, such person may be required to "cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this act [chapter]." The act provides that the findings of the Board as to the facts, if supported by evidence, shall be conclusive.

The Board, as has already been noted, did not accept the superintendent's explanation of his reason for not re-employing this group of workers; but be that as it may, the act contains no exemption because the employer may be of the view that the circumstances with which he is confronted will justify its disregard. As said by the Circuit Court of Appeals of the Ninth Circuit in National Labor Relations Board v. Star Publishing Co., 9 Cir., 97 F.2d 465, in speaking of the purposes of the law, "It permits no immunity because the employer may think that the exigencies of the moment require infraction of the statute. In fact, nothing in the statute permits or justifies its violation by the employer."

A similar situation was considered in McQuay-Norris Mfg. Co. v. N. L. R. B., 7 Cir., 116 F.2d 748, 752. In that case the employees were organized into two unions, both of which were seeking recognition for purpose of collective bargaining, but one of which had been designated as the bargaining agent. The employer, to prevent a strike and discord, undertook to recognize each union for the purpose of collective bargaining for its own members. The union, having a majority, filed charges in answer to which the employer attempted to justify its action on the ground that it feared a recognition of one union to the exclusion of the other "would bring about reprisals by rival unions." In disposing of this contention, the court said: "The Statutory requirement under discussion permits no immunity because of undue hardship or economic pressure imposed upon the employer. It leaves no room for the appeasement of hostile interests by conceding to a Union, properly designated as the bargaining agent, less than the Act requires."

In the instant case, the C.I.O. Union 216 is not the bargaining agent, but it is an established union of employees which the employees have a right to join without penalty or reprisal from the employer. In the final analysis, the members of this group were discriminated against because of their

previous union activities, or at least because of a condition which resulted from such activities. The order of the Board as it affects each of the named employees in this group is, we think, sustained by the evidence.

■ Martin Kral was hired by petitioner on May 4, 1937, and worked until about ten days before the general layoff in December of that year. His own testimony shows that he was laid off because he had been sick and was absent without notice to petitioner. He was told that the company scarcely had work for the people then employed. He was hired during the busy season of 1937, when petitioner was working two egg shifts. He worked as a handy man in the egg breaking and egg candling departments, as a scaler and as a relief truck driver. There is testimony that he was unreliable. The Board ordered that he be offered employment and that he be made whole for loss of pay from July 8, 1938, to date of offer. There is no substantial evidence to sustain this part of the order and it is therefore reversed.

■ Mrs. Beatrice Kral's case is similar to that of her husband, Martin Kral. She worked for petitioner from August 1, 1937, until the general layoff on December 22, 1937. The only time she applied for work was on July 5, 1938. She testified that the superintendent said that he had enough help the way it was but he would keep her in mind. This evidence, applied to one whose work has been casual, is clearly insufficient to show discrimination. The Board ordered petitioner to offer her employment with back pay from July 8, 1938, to the date of offer. Not being sustained by substantial evidence, this part of the order must be reversed.

■ Thelma Pemmrick began work for petitioner on July 7, 1937, in the chicken picking department and was laid off on December 22, 1937. She went to the plant about July 11, 1938, and the superintendent told her there was no work just then but to return later. She was rehired October 25, 1938, just before the turkey season opened with the necessary increase of employment. The Board ordered that she be made whole for any loss of pay from July 8, 1938, to October 26, 1938. In speaking of her work, the Board says: "Presumably Pemmrick's work during the 1937 season had been satisfactory to respondent." The superintendent testified that the only reason he did not employ

her until October, 1938, was that she "was a very slow pinner. I tried to make a ruffer out of her and did not succeed. Up until that time I could get better pinners—could get better pickers than she was." Obviously, this presumption of the Board cannot stand as against this positive, uncontradicted and unimpeached evidence. The order to reimburse her is therefore reversed.

■■ Christian Anderson was hired on July 6, 1936, to work in the poultry feeding station until the general layoff that year. On August 28, 1937, he was again hired in the same department and worked until November, 1937, when he was laid off. He requested work in March, 1938, before the poultry season opened. As to this man, the trial examiner, who saw and heard the witness, found that his employment was casual "and more to his convenience than to the need of respondent. He made no serious application for employment after his layoff," and "that there was no discrimination with regard to the hire and tenure of employment of Anderson because of his union activities." The examiner recommended that the complaint as to Anderson be dismissed. The superintendent testified that he had not seen Anderson all the summer of 1938. The Board found that he was denied re-employment because of his membership in the union and ordered petitioner to offer employment to him and to make whole any loss of pay from July 8, 1938, to the date of the intermediate report, January 6, 1939, and from the date of the Board's order, August 7, 1940. Of course, the report of the examiner is not binding on the Board, but it is entitled to consideration on the question of the substantial character of the evidence. A. E. Staley Mfg. Co. v. N.L.R.B., 7 Cir., 117 F.2d 868. The overwhelming evidence supports the finding of the trial examiner and nothing in the record justifies the order of reinstatement.

■ Mrs. Wilfred Caron was not named in any of the complaints. The trial examiner made no recommendation nor specific findings with reference to her. The Board by its order, however, required petitioner to offer her employment with back pay. She had worked during the turkey rush season in November and December of 1936 and 1937. In July, 1938, she went to the plant and asked for work. She was finally given a job as peeler, a job she had never had before, her pre-

vious work having been as a picker, and she worked for about ten days or two weeks in July, 1938, when she was discharged. The superintendent testified with reference to her discharge as follows:

"Q. Why did you discharge her? A. Because her work wasn't up to standard.

"Q. Did you talk to her before you discharged her? A. I did.

"Q. How long before you discharged her? A. Oh, she worked there perhaps four or five days and the report came to me that her work wasn't what it should be. I stepped back there and watched her three or four times during the day. I could see that it was not. I told her that I wanted to see her before she went home that night. I was out there when they quit work, and I spoke to her and told her it was up to her to hold her job. I couldn't hold her job at all, it was up to her. I warned her and cautioned her that she would have to do her job a little better, otherwise we could not use her.

"Q. How long was it before she was discharged? A. I would say about three or four days."

She testified that she had never done this class of work before. Being asked whether she was objecting that the work was too hard, she testified: "Well that was—that last day we was peeling on the necks and he said—he put another girl with me.

"Q. Why did he do that? Because you were not getting the pin feathers all off? That is the reason is it not? A. Well, I don't know.

"Q. You know as a matter of fact that you were not, don't you? A. Well, I don't know.

"Q. And he put another girl there to help you? A. Yes."

The direct testimony of the superintendent that she was discharged because her work was not satisfactory is corroborated by her own testimony. So far as her affiliation with the C.I.O. is concerned, she testified that before she was put on duty she had told the superintendent that she had dropped the C.I.O. She also testified that the only thing she ever did about joining the C.I.O. was to sign an application card in January, 1938; that she never paid any dues and had never been a member and that she did not consider herself a member. There was testimony that she remarked to a Mrs. Headline that, "I wish the C.I.O. would get down there so we would not have to work so hard." The testimony is undisputed, however, that the superintendent never heard of her remark with reference to her desire to get the C.I.O. into the plant. The evidence that she was discharged for cause is not only substantial but uncontradicted and does not warrant a conclusion that she was discharged because of her supposed friendship for or affiliation with the C.I.O. The order requiring her reinstatement, being without substantial evidence, cannot be sustained.

██ ██ It remains to consider the contention of petitioner that the orders are too broad. Each order contains a provision requiring petitioner to cease and desist from "in any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively, through representatives of their own choosing, or to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the Act."

Each order directed the posting of notices to the effect that petitioner will cease and desist from such practices.

In case No. 496, violations of Section 8 (1), (2) and (3) of the Act are alleged. In case No. 497, violations of Section 8 (1) and (3) are alleged. The orders are broader than the charges or the findings. In National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, at page 437, 61 S.Ct. 693, at page 700, 85 L. Ed. 930, it is said: "We hold only that the National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found. To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past."

██ The orders must be modified so as to limit their effect to the restraint of the unfair labor practices found to have been committed by the petitioner. In case 496, the order should be modified by eliminating from it Paragraph 1(d), that

420

being the general clause above quoted. The order for reinstatement and for back pay must also be modified in accordance with this opinion. In case 497, Paragraph 1 (b) should be eliminated, and the paragraph directing reinstatement and back pay should be modified to conform to the views expressed in this opinion. Both orders contained. provisions that petitioner deduct from the amount of back pay otherwise due to each of the reinstated employees, moneys received by them during said period for work performed upon federal, state, county, municipal, or other work relief projects and to pay over the amount so deducted to the appropriate governmental agencies which had made the payments for the work relief. These provisions are improper and should be eliminated. Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; Cudahy Packing Co. v. N. L. R. B., 8 Cir., 116 F.2d 367. The notice to be posted should in each case conform to the order. As so modified, the orders are affirmed and will be enforced.