AMERICAN SMELTING & REFINING CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 12070.

Circuit Court of Appeals, Eighth Circuit.

March 12, 1942.

---

W. C. Fraser, of Omaha, Neb., (W. M. McFarland, of Chicago, Ill., and R. Worth Vaughan, of New York City, on the brief), for petitioner.

Roman Beck, Senior Atty., of Washington, D. C., National Labor Relations Board (Robert B. Watts, Gen. Counsel, National Labor Relations Board, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, David Findling and Dominick L. Manoli, Attys., all of Washington, D. C., on the brief), for respondent.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

Upon complaint filed against petitioner alleging that it had engaged in and was engaging in unfair labor practices affecting commerce within the meaning of Section 8 (1), (2) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158 (1–3), the National Labor Relations Board, after hearing, issued an order requiring respondent to cease and desist from (a) discouraging membership in Omaha Smeltermens Union No. 461, International Union of Mine, Mill & Smelter Workers, or any other labor organization of its employees, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any terms or conditions thereof; (b) in any manner dominating or interfering with the administration of Employees Representation Plan or Omaha A. S. & R. Company Employees Association, or with the formation and administration of any other labor organization of its employees, and from contributing support to Employees Representation Plan or Omaha A. S. & R. Company Employees Association, or to any other labor organization of its employees; (c) recognizing Omaha A. S. & R. Company Employees Association as the representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of work; (d) in any other man-

ner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157. The order required petitioner to withdraw and withhold from Employees Representation Plan and Omaha A. S. & R. Company Employees Association and any successor thereto, all recognition as representatives of any of its employees for the purpose of dealing with respondent, concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and to disestablish said associations as such representatives; to offer Laurence Behney immediate and full reinstatement to his former or substantially equivalent position without prejudice to his seniority and other rights and privileges; to make whole Laurence Behney and Orville Johnson for any loss of pay they have suffered by reason of the respondent's discrimination against them, by payment to Laurence Behney of a sum of money equal to that which he normally would have earned as wages from May 31, 1939, to the date of offer of reinstatement, and by payment to Orville Johnson of a sum of money equal to that which he normally would have earned as wages from September 8, 1939, to the date of reinstatement, less their respective net earnings during said periods. The order directed the posting of notices throughout the plant for a period of sixty days, and to notify the Board's Regional Director of the steps taken to comply with the order. The order contained provision that the complaint be dismissed so far as it alleged that respondent engaged in unfair labor practices with regard to one Richard Knutzen. The order was based upon findings that petitioner had dominated the Plan and the Association, in violation of Section 8 (1) and (2) and had discriminated against Laurence Behney and Orville Johnson in Violation of Section 8 (1) and (3) of the National Labor Relations Act.

Petitioner seeks review of this order and asks that it be set aside as not sustained by substantial evidence. The Board has answered, praying that petitioner's petition be dismissed and that the order be enforced.

Petitioner is a New Jersey corporation, but maintains and operates mining, smelting, refining and distributing plants in various states, including a plant at Omaha, Nebraska, where it normally employs about 125 men. The Omaha plant alone is involved in this proceeding. In 1933, petitioner furnished printed pamphlets to the employees in its various plants, containing an outline of a Plan for employee representation. The stated purpose of the Plan was "to provide means and facilities for securing cooperation and agreement in respect to conditions and terms of employment." Such an organization was then formed at the Omaha plant (referred to in the record as the "Plan"), and thereafter, through its employee representatives, dealt with the management on labor questions. Under the Plan, grievances were lodged with a committee and the plant manager, who enjoyed "the full privileges of any other member to take part and enter into considerations and discussions," except the right to vote. Petitioner's plant manager was to be furnished by the committee with a copy of its proceedings. The Plan made no provision for dues or for general meetings of the employees. Its expenses were borne by petitioner. Its elections were held in the plant during working hours, without loss of pay to the employees, and employee representatives were paid for the time spent on Plan business. Meetings of the committee were held on company time and property, attended by petitioner's personnel manager. The Plan continued to function from its establishment in 1933 until approximately two years after the National Labor Relations Act became effective on July 5, 1935. Its last meeting seems to have been held in August, 1937. On April 13, 1937, the management expressed doubt as to its right to be represented at any meeting or to permit the Plan's representatives to meet on company property, and the Plan's representatives expressed doubt as to its legality.

The constitutionality of the Act was sustained by the Supreme Court on April 12, 1937, in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and companion cases. Petitioner took no positive steps to dissolve or disestablish the Plan. The plant manager suggested to certain employees on April 13, 1937, that the Plan might properly continue to function provided no

company representative attended its meetings. There was evidence that a meeting of the representatives of the Plan was held August 10, 1937, for the purpose of deciding whether to drop the Plan, but this meeting was apparently without knowledge or participation of the management. At that meeting, the Plan leaders discussed the effect of the Labor Act as construed by the Supreme Court and decided to hold a general meeting of employees outside the plant for the purpose of putting the proposition of forming an organization of employees independent of any outside labor organization before the body. Following this meeting of August 10, the plant manager expressed to certain employees the desire to cooperate with and assist an independent union, advising that he was opposed to and would not cooperate with any organization affiliated with the A. F. of L., or C. I. O., and it would therefore be to the advantage of the employees to form an unaffiliated union, rather than join an outside organization. A witness, referring to the plant manager, testified:

"And he said he wanted it kept an independent union, that if it was an independent union he would do everything in his power to help us fellows; he would cooperate with us 100 per cent if it was an independent union, but if we affiliated with the A. F. of L. or C. I. O., he would do nothing to help us, that he would wash his hands of the whole thing and would only give us what he was forced to do. * * * He explained that it was better to keep control of the organizations. in the hands of the plant employees than to let it get on the outside. He figured an independent union could do more for us than an outside organization—that he was willing to do more for us if it was an independent organization."

The manager a few days later said to the secretary of the Plan committee that he could go a long way in helping the employees if they would refrain from outside affiliation and would stick with an independent organization.

On August 19, 1937, a meeting of employees was held pursuant to notices posted on the plant bulletin board. The chairman of the Plan committee presided. An attorney was in attendance at the invitation of the Plan committeemen, who addressed the meeting with reference to the Labor Act. The employees voted to form an independent organization and designated a committee composed of former Plan committemen to assist the attorney in preparing a constitution for the new organization. This constitution was adopted at a later meeting, and the new organization was called Omaha A. S. & R. Company Employees Association, and is referred to in the record as the "Association." In September, 1937, before the completion of the Association organization, the plant manager called to his office the Plan committeemen who, reporting the progress made in the new organization, requested the manager's criticism. The manager thanked them for the manner in which the new organizing activities were being conducted, and informed them that he was attempting to secure a general wage increase which they had requested; that he had wished to withhold this increase as long as possible so that the new organization might be given credit by the employees with having secured the raise. During the formative period of the association, the open solicitation of members was permitted in the plant during working hours, and the first election of officers was held in the plant and the election results were posted in the plant office. Five of the nine officers of the new organization were former members of the Plan committee. On July 29, 1937, the plant manager recognized that organization as the exclusive bargaining agent of the petitioner's employees and the following day posted a notice in the plant to that effect. After its organization the Association operated chiefly as a clearing house for complaints. Its representatives met regularly with the plant manager to discuss grievances and general conditions of employment but entered into no contractual relations with petitioner concerning wages and hours or other conditions of employment.

In November, 1938, some nineteen employees joined Local Union No. 461, affiliated with the C. I. O. organization, and applied for a charter. Shortly after these employees had joined Local Union 461, the manager called to his office three representative employees and stated that he had heard that an outside union was attempting to organize the plant and suggested that the outside union could do nothing for them; that it was simply interested in the employees' money, and that he had always regarded the employees in the plant as "one big family" and had

secured substantial benefits for them, but that if the C. I. O. came into the plant he would do nothing for the men. He then asked these three employees to talk to their fellow workers and stop the movement. At about the same time, the personnel manager inquired of an employee what he and his son thought of the C. I. O. organizational efforts and declared that he could not see why the employees wished another organization since they already had a good union in the plant. The same employee was later told by his foreman that petitioner desired all of its older employees to belong to the Association. He was told by the manager that the organizer for Local 461 was "no good" and a "double crosser," and that he would "cut your throat for a nickel." The manager also said in this conversation that it would be "just too damned bad" if Local 461 succeeded in organizing the plant, and that petitioner would close the plant rather than consent to a closed shop.

In May, 1939, Local 461 claimed to represent a majority of petitioner's employees in the Omaha plant and made formal demand upon the manager for recognition. By that time the manager knew that a group of the Association members had voted to dissolve it but he continued to recognize the Association, though he refused to discuss a grievance with Local 461 in the presence of an "outsider," who was a member of the Local 461 committee, or to meet "generally" with that organization unless it secured certification from the Board. Restrictions were placed upon union activities of employees during working hours at the time when Local 461 was attempting to increase its membership. On December 22, 1939, the manager posted a notice of a general wage increase, and stated in the notice that the increase was granted as a result of negotiations with the Association.

There is more or less conflict in the evidence as to the above incidents, but that conflict has been resolved by the Board against the petitioner. The Board found that the Association was an outgrowth of the Plan and that it had been and was dominated and supported by the petitioner. There can be no doubt that there was abundant substantial evidence tending to prove that the Plan was dominated and supported by the petitioner. That may have been a benevolent domination having for its purpose the providing of means and facilities for securing cooperation and agreement between the petitioner and its employees and to treat the employees and the petitioner's officers as "one big family." But this purpose is not in keeping with the plan and spirit of the Act as it has been construed by the decisions of the Supreme Court. So far as labor problems and relations are concerned, the employees must be left free and untrammeled in forming, maintaining or joining such labor organizations as they chose. It was the duty of the petitioner to disestablish the Plan which had previously been dominated by it and which it had recognized as a bargaining unit. This was "the only effective way of wiping the slate clean and affording the employees an opportunity to start afresh in organizing for the adjustment of their relations with the employer." N.L.R.B. v. Newport News Shipbuilding, etc., Co., 308 U.S. 241, 60 S.Ct. 203, 208, 84 L.Ed. 219; N.L.R.B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N.L.R.B. v. Rath Packing Co., 8 Cir., 123 F.2d 684. The failure of petitioner to take affirmative steps to disabuse the minds of the employees generally of the belief which they may have had that the petitioner favored the Association as it favored the Plan, warranted the Board in finding that the employees were not, in joining the Association, as free as the statute demands. Kansas City Power & Light Company v. N.L.R.B., 8 Cir., 111 F.2d 340; N.L.R.B. v. Newport News Shipbuilding, etc., Co., supra. There was in the instant case no well-defined "wiping of the slate clean." Petitioner made no positive attempt to terminate the existence of the Plan which it dominated, nor to disassociate it from the employees' choice of a bargaining agency. The organization of the Association was apparently promoted by those who were officers or committeemen of the Plan, and they were largely continued in office under the Association. There was evidence too of petitioner's hostility to Local 461, as contrasted with its friendliness to the Association. We think it can not be said that the Board's finding that petitioner's domination of the Plan was never eliminated and the employees left free to act upon their own initiative, is not sustained by substantial evidence. The Association, under the circumstances, could not be said to be the free selection of the employees, and the Board's finding that it was not established by the

"free and voluntary act" of the employees "but was the product of petitioner's continued interference with and domination of the employees," is supported by substantial evidence.

The order to cease dominating the Plan and the Association and withdraw recognition from them as the representatives of any of the employees must be sustained, as well as that part of the order requiring petitioner to cease and desist from discouraging membership in Omaha Smeltermens Union No. 461, or any other labor organization of its employees.

The Board found that petitioner discriminatorily laid off Laurence Behney and likewise refused to reinstate him. It also found that petitioner discriminatorily delayed the reinstatement of Orville Johnson, by which acts it discouraged membership in Local Union 461.

■ The Act gives the Board no supervisory powers over the conduct of a business, nor may it concern itself with the question of discrimination or wrongful discharge or other improper treatment of an employee, unless such acts were prompted by the employee's union activities or affiliations. The burden of proof on that issue rested upon the Board to show by substantial evidence that the employee was discharged because of such activities or affiliations.

The plant operations at Omaha were such as to necessitate from time to time a layoff of employees who might be recalled again during various intervals of work. Seniority of employment was only one of the many factors considered in laying off men at such times. There is no evidence nor is there any claim, that the petitioner, during any period of a large scale curtailment of plant operations during which Behney was laid off, discriminated against any officer or member of the C. I. O. The qualifications of the employee for the particular work in hand and his experience in the department where the work was to be performed were important elements to be considered. Behney, who was a member of Local Union 461, had been in petitioner's employ for upwards of five years as an unskilled workman. He was laid off on May 30, 1939, during a period of general layoffs because of slack business, and this is the layoff which the Board found to be discriminatory. After a curtailment started on May 1, 1939, Behney was transferred to the unloading department because there was work there at the time and not in the department where he had been working. On May 17, 1939, one Fedor, having practically the same seniority as Behney, was laid off from the refining department and Behney continued to work in the unloading department. Then, on May 30, Fedor, having in the meantime been reinstated, was employed with Behney and two others in the unloading department. Behney and the two others were laid off as there was work for but one and Fedor was retained as there was shortly to be work for him in the refining department from which he had earlier been transferred, and he was a better all-around employee. Fedor at the time was not a member of Union 461, though he became a member shortly after May 30, 1939.

■ Prior to the date Behney was laid off, he, with certain other employees, including one Svendsen, President of the Local Union 461, visited the Board's Regional Office to institute proceedings against petitioner. Referring to this incident the Board found that, "The following day Behney, in answer to an inquiry, replied within the hearing of his foreman that he had 'been to Kansas City to see the Labor Board.' Harms admitted having knowledge of Behney's trip to the Regional office of the Board in Kansas City within a few days after it had been made." Behney was not an officer of the union, nor had he been active in its affairs. There was affirmative testimony on behalf of the petitioner that Fedor was retained because he had refining experience and was, in view of the work on hand, a more desirable workman. This seems to have been the judgment of the management and that judgment can not be superseded by the judgment of the Board. The Act gives no authority to the Board to interfere with the normal exercise of the right of the employer to select its employees. Cupples Co. Manufacturers v. N.L.R.B., 8 Cir., 106 F.2d 100. There is no claim and there was no proof, as has already been noted, that petitioner made any general discrimination against the members of the C. I. O. in laying off its men, and it seems scarcely probable that Behney should alone have been singled out for such discrimination. As said by the Seventh Circuit Court of Appeals in N.L.R.B. v. Auburn Foundry, 119 F.2d 331, 335,

"There is no direct evidence to support the Board's finding, but a number of infer-

ences are relied upon. It is of some significance, we think, that Livergood was the only member of the C. I. O. who, it is claimed, was discriminately discharged. The record does not disclose the number of employees belonging to the C. I. O. * * *. The fact that only one unlawful discharge is claimed rather clearly demonstrates that respondent pursued a policy contrary to that charged in this isolated instance."

■ Behney was not high in the councils of the union and there is no claim that those who were officers or were active in the union's affairs were discriminated against. The finding of fact must have more than a mere possibility or a suspicion to sustain it, and we can find no substantial evidence sustaining the finding that the layoff of Behney was discriminatory within the meaning of the Act. It is, however, said that he has been discriminated against in not having been reemployed. Here again, it is important to have in mind that the discrimination must have been because of his union affiliations or activities.

Being of the view that the evidence does not sustain a finding that he was discriminatorily discharged, it remains to consider whether the delay in reemploying him was discriminatory. Behney was apparently a quick-tempered man, being referred to as being "hot-headed." He had had a number of altercations with his superiors. The record shows that on prior occasions he had had one or two fights and many heated arguments. He felt that he was discriminated against in being laid off, and he pointed to the retention of several others whom he thought he outranked, but it transpired that the others to whom he referred were members of the C. I. O., except Fedor, who at that time was not a member. According to the evidence, he went to the superintendent of personnel and also to the plant manager, with rather positive demands for explanations as to why he had been laid off. He also seemed to have been very insistent as to when he was to be reinstated. If the evidence of the manager be discredited, as apparently the Board discredited it, the fact remains that Behney's conduct on his various visits to the manager's office was such as to attract the attention of those in adjoining offices or rooms. The manager says that he threatened violence, if not reinstated, to the plant; to the manager's home and his family. The day following his layoff he

demanded his vacation, which he was advised could not be given him until he had returned to work. This was the same course pursued with Mr. Svendsen, the president of the C. I. O., who had been laid off, and about whom no complaint is made. Behney made four visits to the manager's office and each time seems to have been very angry and excited, the incidents being referred to by counsel for the Board as "minor misconduct." Of course, minor misconduct would not deprive the Board of the power to apply the remedial provisions of the Act unless the minor misconduct was the cause for the refusal of the employer to reinstate. There is no substantial evidence that the refusal to reinstate was attributable in any degree to Behney's union activities or affiliations. Whether his misconduct was sufficient reason for the manager's refusal to reemploy him is not material. It manifestly was the reason, and hence, the order with reference to the reinstatement of Behney with back pay can not be sustained.

■ Orville Johnson was employed by petitioner in 1906. He worked as a crane operator, blast furnace operator, foreman in the smelting department, and in various other capacities. He was employed in the carpenter shop as a mechanic's helper at the time of his layoff on May 19, 1939. He was reinstated on September 28, 1939. He made no application for reinstatement until September 8, 1939. He applied for reinstatement several times between the first week in September and September 25th. He was recalled on September 28th, so that the delay complained of was twenty days. The testimony showed that the mechanical department was not operating before September 28th, and at that time he was given employment in that department; that it was the policy of the petitioner not to permit mechanical department employees to work in other departments or divisions, and the evidence is undisputed that no work was available in the mechanical department until after September 28th. He was a member of the C. I. O. and had been more or less active during his layoff between May 19th and the time of his reemployment. He was an ex-foreman. His services, in the judgment of the management, were not required until the mechanical department opened up, and that occurred within twenty days after he sought reemployment, and when it did open up he was reemployed. The

Board concluded that this few days' delay in reemploying Johnson was because of his union activities, but this at most is surmise and suspicion which does not reach the dignity of substantial evidence. Apparently, all of the C. I. O. officers and other members were rehired without discrimination. It is not conceivable that a delay of twenty days in rehiring Johnson could have had any effect on the C. I. O. membership. The officers of the petitioner denied any unlawful motive or purpose for the delay in reemploying Johnson but assigned reasons which have not been denied. The reasons assigned by them are consistent with the existing situation and their testimony can not be entirely disregarded on the mere ground of suspicion. Neither direct testimony nor circumstances impeach this testimony. What is said by the Fifth Circuit Court of Appeals in N.L.R.B. v. Tex-O-Kan Flour Mills Co., 122 F.2d 433, 438, is here apposite. It is there said:

"Orders for reinstatement of employees with back pay are somewhat different. They may impoverish or break an employer, and while they are not in law penal orders, they are in the nature of penalties for the infraction of law. The evidence to justify them ought therefore to be substantial, and surmise or suspicion, even though reasonable, is not enough. The duty to weigh and test the evidence is of course on the Board. This court may not overrule a fact conclusion supported by substantial evidence, even though we deem it incorrect under all the evidence. Only when the evidence is such that in a jury trial it would be insufficient to support a like verdict may the judges interfere. National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985. So far as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., goes, the employer may discharge, or refuse to reemploy for any reason, just or unjust, except discrimination because of union activities and relationships. In the matters now concerning us, the controlling and ultimate fact question is the true reason which governed the very person who discharged or refused to reemploy in each instance. There is no doubt that each employee here making complaint was discharged, or if laid off was not reemployed, and that he was at the time a member of the union. In each case such membership may have been the cause, for the union was not welcomed by the persons having authority to discharge and employ. If no other reason is apparent, union membership may logically be inferred. Even though the discharger disavows it under oath, if he can assign no other credible motive or cause, he need not be believed. But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity, but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point. This was squarely ruled as to a jury in Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, and the ruling is applicable to the Board as factfinder. That the witness was or is an employee of the party in whose behalf he testifies, is not in itself a reason to discard his oath, appears from the cited case, and was extensively demonstrated in Chesapeake & Ohio R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983."

See, also, Nevada Consol. Copper Corp. v. N.L.R.B., 10 Cir., 122 F.2d 587; Virginia Electric & Power Co. v. N.L.R.B., 4 Cir., 115 F.2d 414; N.L.R.B. v. Automotive Maintenance Machinery Co., 7 Cir., 116 F.2d 350.

We conclude that the finding that delay in reinstating Johnson was discriminatory is not sustained by substantial evidence.

It is observed that the cease and desist order contains the following provision:

"(d) In any other manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed by Section 7 of the Act."

We think the order is broader than warranted by the charges or the findings. The Board is without authority to enjoin violations of all the provisions of the statute merely because the violation

of one has been found. There is no proof or finding that there is danger that the petitioner will in the future violate Section 7 of the Act. We think this provision should be eliminated. N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930; Republic Steel Corp. v. N.L.R.B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; Cudahy Packing Co. v. N.L.R.B., 8 Cir., 116 F.2d 367; Wilson & Co., Inc., v. N.L.R.B., 8 Cir., 123 F.2d 411.

The order appealed from must be modified so as to limit its effect to the restraint of the unfair labor practices found to have been committed by the petitioner. The paragraph of the order directing the petitioner to offer Laurence Behney immediate and full reinstatement in his former or substantially equivalent position without prejudice to his seniority and other rights and privileges, and the provision to make said Laurence Behney and Orville Johnson whole for any loss of pay they may have suffered by reason of the petitioner's alleged discrimination against them, by payment to Behney of a sum of money equal to that which he normally would have earned as wages from May 31, 1939, to the date of offer of reinstatement, and by paying to Orville Johnson of a sum of money equal to that which he normally would have earned as wages from September 8, 1939, to the date of reinstatement, less their respective net earnings during said periods, should be eliminated. The notices to be posted should conform to the order. As so modified, the order appealed from will be enforced.