**CANYON CORPORATION v. NATIONAL LABOR RELATIONS BOARD.**

No. 12165.

*Circuit Court of Appeals, Eighth Circuit.*
June 30, 1942.

954

Alex Rentto, of Deadwood, S. D. (Robert C. Hayes, of Deadwood, S. D., on the brief), for petitioner.

L. N. D. Wells, Jr., of St. Louis, Mo., Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Roman Beck and William J. Avrutis, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

Petitioner seeks review of an order entered against it under the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., and the Board requests enforcement of the order.

One of petitioner's contentions is that its activities are not a part of, nor do they affect, interstate commerce, and that it therefore is not subject to the Act. Petitioner's business is that of mining, refining, and selling gold bullion. Its properties, plant, and office are located at Maitland, in the Black Hills, near Deadwood, South Dakota. It produces approximately $500,000 worth of bullion annually, which it ships by railway express from Deadwood, South Dakota, and sells to the United States mint at Denver, Colorado. The argument made here is that, under the Gold Reserve Act of 1934, 48 Stat. 337, 31 U.S.C.A. § 440 et seq., gold is no longer actually an article of trade or commerce,[1] and that its production and interstate shipment cannot therefore legitimately be regarded as "affecting commerce", within the meaning of the National Labor Relations Act.

Such a construction of the Act would be a strained one and out of harmony with the fundamental policy which Congress was attempting to achieve in the general field of industrial relations. The production and shipment of gold bullion by a mine and refinery in one state, for the purpose of selling it to a United States mint in another state, is, in our opinion, plainly and literally "commerce" within the definition of section 2(6) of the Act,[2] even though the United States may be the only customer to which such bullion can legally be sold.[3] As a matter of fact, however, the Treasury Department has, by appropriate regulations,

[1] Under § 3 of the Gold Reserve Act of 1934, 48 Stat. 340, 31 U.S.C.A. § 442, "Gold in any form may be acquired, transported, melted or treated, imported, exported, or earmarked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by, and subject to the conditions prescribed in, or pursuant to, such regulations" (as the Secretary of the Treasury shall prescribe, with the approval of the President). The section further expressly authorizes the making of regulations, among other things, for gold required "for industrial, professional, and artistic use". The Secretary of the Treasury has accordingly promulgated appropriate regulations, one of

which provides that "The mints shall issue licenses authorizing the acquisition and holding, transportation, melting and treating, importing, exporting, and holding for domestic account of gold which the mint is satisfied is required for legitimate and customary use in industry, profession, or art * * *". See 31 C.F. R. § 54.23.

[2] "(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States * * *."

[3] Cf. N.L.R.B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 784, certiorari denied 312 U.S. 678, 61 S.Ct. 447, 85 L. Ed. 1118.

authorized the sale of refined gold on the part of producers, under proper licenses, to certain private users throughout the country for industrial, professional and artistic purposes.[4] In addition to all of the foregoing, the record shows also that petitioner annually sells and ships approximately $5,000 worth of slag from its plant to a smelting company at East Helena, Montana, and further that, out of a total of $134,000 worth of materials and supplies purchased annually for use in petitioner's operations, $64,000 worth are transported to its plant from outside the state. The Board considered all of these facts together, as it had a right to do, and from the whole concluded that petitioner's operations clearly affected commerce within the meaning of the Act, and that a labor dispute at its plant, interrupting its operations, would tend to hinder and obstruct commerce and the free flow thereof. This finding and conclusion were not only warranted, but we think compelled, on the facts and under the law.[5]

██ Petitioner's next contention is that there is no substantial evidence to support the Board's findings that it had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed to them under the Act, and that it had discriminatorily discharged two employees, whom the Board ordered reinstated with back pay. On the first point, there was evidence from which the Board could infer, and find as a fact, general hostility on the part of petitioner to union organization; efforts to discourage such organization in the plant; attempts by a foreman to persuade men under him to withdraw from the union; threats to shut down the mine if it was unionized; efforts to circumvent and neutralize union organization by "hand-picking"

and dealing with a selected group of employees on the question that had prompted union entry into the plant; attempts to influence the result of the election which was to be held at the plant, by offers on the part of the mine superintendent to bet with employees that the union would lose the election; surveillance of and report to the employer on a union meeting by a chief clerk in the vice-president's office, with no attempt on the part of such employee at the hearing to explain the incident; and other significant events and circumstances also which are set out in the Board's decision and order, 33 N.L.R.B. 163, but which need not be detailed here. Petitioner attempts to discuss these incidents individually and in isolation, in order to minimize the force of their implication, but the Board was not thus required to weigh the situation. It had a right to consider the facts and incidents shown by the testimony, not simply in isolation, but cumulatively and compositely as well, in arriving at its inferences and conclusions. Thus considered, the Board was privileged to hold, as it did, that petitioner had interfered with, restrained and coerced its employees in the exercise of their right of self-organization, in violation of section 8(1) of the Act.[6]

██ Petitioner argues that the Board could not properly give consideration to evidence of violations occurring prior to July 22, 1940, because the agreement which it had entered into with the Board on that date recognized the right of its employees to organize and agreed not to interfere with that right and so had wiped the slate clean up to that time. An agreement by an employer to refrain from certain unfair labor practices, which has not been observed, does not preclude consideration by the Board of

---

[4] A communication from the Director of the Mint to the Board, dated March 12, 1942, copy of which is appended to the Board's brief, states that "there are now in effect slightly more than 2,000 licenses which authorize the licensees to acquire, from lawful sources under the limitations of such licenses, gold which has been melted, smelted, refined or otherwise treated".

[5] See N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N.L.R.B. v. Fainblatt, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; N.L.R.B. v. Crowe Coal Co., 8 Cir., 104

F.2d 633, 636, 638, 639, certiorari denied 308 U.S. 584, 60 S.Ct. 107, 84 L. Ed. 489; N.L.R.B. v. Suburban Lumber Co., 3 Cir., 121 F.2d 829, 832.

[6] Compare H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; N.L.R.B. v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 58 S.Ct. 577, 82 L. Ed. 838; N.L.R.B. v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352; Hamilton-Brown Shoe Co. v. N.L.R.B., 8 Cir., 104 F.2d 49; N.L.R.B. v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288; N.L.R.B. v. Viking Pump Co., 8 Cir., 113 F.2d 759; N.L.R.B. v. Brashear Freight Lines, 8 Cir., 119 F.2d 379; N.L.R.B. v. Blanton Co., 8 Cir., 121 F.2d 564.

the employer's conduct prior to the agreement, in connection with subsequent unfair practices, in determining whether the employer has been guilty of violating the provisions of the Act.[7] Here, the Board was justified in finding that petitioner had "continued its unfair labor practices since the settlement (of July 22, 1940), and in disregard of its specific terms", and these previous unfair practices were therefore entitled to be considered in connection with petitioner's subsequent conduct on the question of the Board's right to enter a cease and desist order against further violations of the Act.

 As to the two employees whom the Board ordered reinstated with back pay, petitioner argues that the evidence shows conclusively that these employees were discharged for neglect of duty in the one case and for insubordination and refusal to do assigned work in the other. Doubtless the Board might have found the facts to be as petitioner contends, but on the whole record it was also at liberty to find that the discharges were made because of union affiliation and activity. It can serve no useful purpose to review the evidence here. The situation is clearly within the scope of the recent decision in N. L. R. B. v. Nevada Consolidated Copper Corporation, 62 S.Ct. 960, 961, 86 L.Ed. ——, where the Supreme Court, in reversing 10 Cir., 122 F.2d 587, took occasion to re-emphasize: "We have repeatedly held that Congress, by providing, § 10(c), (e) and (f), of the National Labor Relations Act, that the Board's findings 'as to the facts, if supported by evidence, shall be conclusive', precludes the courts from weighing evidence in reviewing the Board's orders, and if the findings of the Board are supported by evidence the courts are not free to set them aside even though the Board could have drawn different inferences." The existence of a just cause for discharge is not necessarily conclusive of the employer's motive, since "the possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them". 62 S.Ct. at page 961.

Petitioner's final contention is that the cease and desist provisions of the Board's order are too broad and are beyond its powers under the Act. The order requires petitioner to cease and desist from:

"1(a) Discouraging membership in Black Hills Mine and Mill Workers Union No. 22417, A. F. of L., *or any other labor organization of its employees,* by discharging any of its employees, or in any other manner discriminating in regard to their hire and tenure of employment or any term or condition thereof; (Italics added).

"1(b) In any other manner interfering with, restraining or coercing its employees in the exercise of their right, to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid and protection, as guaranteed in Section 7 of the National Labor Relations Act."

 Complaint is made of the inclusion of the words "or any other labor organization of its employees" in subdivision 1(a) of the order. The evidence here showed that petitioner was guilty of hostility to union organization in general, and not merely to the particular union involved. The charges against it specifically alleged that it had "advised, urged, threatened, and warned its employees to refrain from becoming or remaining members of the Union or any other labor organization, and from assisting the Union or any other labor organization". In such a situation, an order requiring an employer to refrain generally from discouraging membership in any labor organization of its employees by discriminatory practices is clearly proper.[8]

 As to subdivision 1(b) of the Board's order, the treatment of such a general cease and desist provision has been somewhat variant in our previous decisions. Compare N. L. R. B. v. Youngstown Mines Corp., 8 Cir., 123 F.2d 178, Wilson & Co., Inc., v. N. L. R. B., 8 Cir., 123 F.2d 411, and American Smelting & Refining Co. v. N. L. R. B., 8 Cir., 126 F.2d 680. The Supreme Court has said, in N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 436, 437, 61 S.Ct. 693, 85 L.Ed. 930, that the Board may enjoin unfair labor practices proved and other like or related unlawful acts, but that it does not have authority to enjoin all the provisions of the statute merely because the violation of one has been found. Here, the unfair labor

---

[7] See N.L.R.B. v. Hawk and Buck Company, Inc., 5 Cir., 120 F.2d 903, 905.

[8] Cf. N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930.

practices charged and proved, in addition to the discriminatory discharges covered by subdivision 1(a) of the order, consisted in petitioner's having "advised, urged, threatened and warned its employees to refrain from becoming or remaining members of the Union or any other labor organization", and in having attempted, by other acts and conduct also, to coerce, induce, and influence them not to become union members.

We think that, in the circumstances of the case, subdivision 1(b) of the Board's order ought accordingly to be modified and limited to read in substance as follows: 1(b) Attempting in any other manner to coerce, induce, or influence its employees not to become members of a union organization. The posted notices should, of course, conform to the modification.

As thus modified, the Board's order will be enforced.